**Maxwell HOFFMAN, Petitioner,**

v.

**A.J. ARAVE, Warden, et al., Respondents.**

**No. 94–0200–S–BLW.**

United States District Court, D. Idaho.

Dec. 28, 1998.

---

Ellison M. Matthews, Boise, ID, Charles F. Peterson, Boise, ID, for Maxwell Hoffman, petitioner.

Alan G. Lance, Office of Attorney General, Boise, ID, Kenneth M. Robins, L. LaMont Anderson, Office of Attorney General, Criminal Law Division, Capital Litigation Unit, Boise, ID, for A.J. Arave, respondent.

## MEMORANDUM DECISION AND ORDER ON PETITION FOR WRIT OF HABEAS CORPUS

WINMILL, District Judge.

### I. *Overview.*

On June 1, 1998, the Court heard oral argument on the Amended Petition for Writ of Habeas Corpus. After considering the arguments of counsel and thoroughly reviewing the briefs and the state court record, the Court concludes that it will deny the petition for the reasons stated in this decision.

### II. *State Procedural History.*

On June 9, 1989, following a jury trial and verdict of guilty, the petitioner was sentenced to death for murder of Denise Williams. The petitioner filed a Petition for Post–Conviction Relief in the state district court, which was denied, and appealed his sentence and the denial of the post-conviction petition to the Idaho Supreme Court. On January 29, 1993, the Idaho Supreme Court affirmed the sentence and the trial court's denial of the post-conviction petition. *See State v. Hoffman,* 123 Idaho 638, 851 P.2d 934 (1993). The petitioner filed a second petition for post-conviction relief which was denied by the trial court.

### III. *Federal Procedural History.*

On May 2, 1994, the petitioner filed a statement of issues, application for stay of

execution, and appointment of counsel with this Court. Following appointment of counsel, and the issuance of a stay of execution, a first Petition for Writ of Habeas Corpus was filed on December 1, 1994. A subsequent finalized petition was filed on April 2, 1996, following discovery and depositions of trial counsel. The petition asserted fourteen claims of constitutional error. On June 13, 1997, this Court entered a Memorandum Decision and Order dismissing several claims in the petition under the doctrine of procedural default.[1] *See Hoffman v. Arave,* 973 F.Supp. 1152 (D.Idaho 1997). Following seven claims alleging constitutional violations remain for a determination on the merits.

 a) Claim A: alleging that the "heinous, atrocious and cruel" aggravating factor found by the state court was unconstitutionally vague and not supported by sufficient evidence.

 b) Claim B: alleging the state court violated the petitioner's due process rights under the Fourteenth Amendment by failing to authorize funds for a psychiatrist during the post-conviction proceeding.

 c) Claim C: alleging the state court violated the petitioner's right to counsel under the Sixth and Fourteenth Amendments by denying his request that his attorney to be present for the pre-sentence interview.

 d) Claim G: alleging the state court violated the petitioner's rights under the Eighth and Fourteenth Amendments by imposing the death penalty without proof the petitioner killed, attempted to kill, intended to kill, or acted with reckless indifference to human life.

 e) Claim I: alleging the state court violated the petitioner's right of confrontation under the Sixth Amendment by admitting the out-of-court statements of Richard Holmes.

 f) Claim L: alleging the state court violated the petitioner's rights under the Fifth, Eighth and Fourteenth Amendments by improperly weighing the aggravating and mitigating evidence submitted during the sentencing hearing.

 g) Claim M: alleging that the application of the Idaho post-conviction relief statute, I.C. § 19–2719, denies the petitioner his due process and equal protection rights guaranteed by the Fourteenth Amendment.

On February 27, 1998, the petitioner filed a pro se motion to dismiss current habeas counsel, drop all further appeals, and vacate the stay of execution. The petitioner also sought an injunction preventing counsel from filing documents on his behalf without his consent. The Court proceeded with a competency evaluation of the petitioner, and on May 8, 1998, determined the petitioner was competent to dismiss his appeals. On June 1, 1998, following a hearing on the petitioner's Motion to Alter and Amend, the petition was reinstated, and a final hearing was set for July 27, 1998.

## IV. *Factual History.*[2]

On September 10, 1987, Denise Williams, while working as a confidential informant with the Nampa Police Department, made a controlled buy of narcotics from Richard Holmes. Following the purchase, the police arrested Holmes and conducted a search of his house. That search resulted in the discovery of a large quantity of drugs and items related to Holmes' drug business. During the arrest of

---

**1.** The following claims were dismissed on the basis of procedural default: Claims B (to the extent the claim relied on the Fifth, Sixth and Eighth Amendments), D, E, H, J, K, M (to the extent the claim alleged denial of effective assistance of counsel), and N.

 In the alternative Claims H, J, K were dismissed on the merits. Claim F was dismissed

with prejudice for failure to state a violation of the Constitution or a law or treaty of the United States.

**2.** This account of the murder is based on the testimony taken at the petitioner's trial.

Holmes, actions taken by the police and Williams led Holmes to believe that Williams was working for the police. Holmes was released on bail pending trial and apparently returned home where he lived with his wife and children and two colleagues, Max Hoffman and Ron Wages.

Two of Holmes' other associates, Jim Slawson and Sam Longstreet, subsequently met with Holmes to inform him that Longstreet did not "set him up." At this meeting Holmes inquired whether Longstreet and Slawson would kill Williams for her involvement in his arrest and to prevent her from testifying at his preliminary hearing. Longstreet and Slawson indicated that they would not kill Williams, but would help Holmes in other ways. This conversation occurred outside the presence of Hoffman and Wages.

On the following day, Holmes met at his house with Longstreet, Slawson, Wages and Hoffman. At that meeting, Longstreet and Slawson agreed to kidnap Williams and take her to a Boy Scout camp in Owyhee County. Holmes, Longstreet, Slawson and Wages then drove to the camp to plan the details of the kidnaping. It was then agreed that Longstreet and Slawson would kidnap Williams, call Holmes to keep him informed, and take Williams to the camp. Wages would then meet them at the camp, where they would tie Williams to a tree and wait until Holmes arrived.

The next evening, Holmes and Hoffman took Wages out to the camp, where the men ingested drugs. Holmes and Hoffman then left the area. Longstreet and Slawson arrived some time later with Williams. Longstreet later testified that he and Slawson had tricked Williams into going with them by telling her that they would take her to buy alcohol and then drove around using drugs and drinking alcohol. During this time, Longstreet pulled over to call Holmes and inform him they had Williams. Longstreet and Slawson then pretended to get lost and arrived at the camp. Wages met them there and ordered them out of the car. Wages then

ordered Longstreet and Slawson to strip Williams and tie her up. Longstreet and Slawson did as directed, and then left the camp.

Hoffman arrived at the camp and he and Wages loaded Williams into a car and met Holmes at the old ION highway cutoff. There, Holmes kicked Williams in the head and told her she was "a dead bitch." Holmes then left and later returned in a brown Nissan four wheel drive truck and told Hoffman and Wages, "You know what to do." Holmes then left again.

Hoffman and Wages put Williams in the Nissan and drove around for several hours, before stopping in Delamar, Idaho. There Hoffman and Wages instructed Williams to write two letters to the press which would exonerate Holmes of the drug charges. Williams was then taken to a cave outside of Silver City, Idaho, where Hoffman slashed her throat with a knife. As Hoffman returned from the cave to the Nissan, Wages spotted Williams crawling up an embankment near the cave, he pursued her and stabbed her under the arm with a knife that Hoffman handed to him. At this point, Williams was on the ground, and Hoffman and Wages, thinking she was dead, buried her under a pile of rocks. It was later determined that the cause of death was a crushing blow to the head.

As a result of the ensuing police investigation into Williams' disappearance, Longstreet and Slawson agreed to provide the police with information concerning the crime in exchange for a sentencing recommendation on a charge of kidnaping. Based on that information, Holmes and Wages were indicted on charges of conspiracy to commit murder. In an effort to secure a plea agreement, Holmes led the police to Williams' body. The conspiracy charges against Holmes were dismissed, but on August 22, 1988, he was subsequently charged with aiding and abetting in the crime of first degree murder.

Following the discovery of Williams' body, Wages confessed to the killing and became a witness for the State, giving

them a full account of the series of events that resulted in the murder. Wages and Hoffman were then charged with first degree murder in Owyhee County. Wages was the principal witness against Hoffman at his preliminary hearing. Hoffman tried to call Holmes as a witness, but Holmes invoked his Fifth Amendment right against self incrimination and refused to testify. Following that hearing, and while incarcerated at the Idaho State Correctional Institution, Holmes was killed by another prisoner.

Hoffman went to trial on the charge of first degree murder and, following a guilty verdict, was sentenced to death on June 9, 1989. In pronouncing the sentence of death, the trial court relied on two statutory aggravating factors, (1) the victim was a witness, and (2) the killing was committed in a particularly cruel, atrocious and heinous manner, exhibiting exceptional depravity.

### V. *Discussion of Remaining Claims.*

#### 1. Claim A.

██ The petitioner contends that the aggravating factor listed under I.C. § 19–2515(h)(5), which authorizes the imposition of the death penalty where "the murder was especially heinous, atrocious or cruel, manifesting exceptional depravity," is unconstitutionally vague and supported by insufficient evidence. In *Arave v. Creech*, 507 U.S. 463, 113 S.Ct. 1534, 123 L.Ed.2d 188 (1993), the Supreme Court reaffirmed the principle that in order to satisfy the Eighth and Fourteenth Amendments, a capital sentencing scheme must "suitably direc[t] and limi[t]" the sentencer's discretion "so as to minimize the risk of wholly arbitrary and capricious action." *Creech*, 507 U.S. at 470, 113 S.Ct. 1534 (citing *Lewis v. Jeffers*, 497 U.S. 764, 774, 110 S.Ct. 3092, 111 L.Ed.2d 606 (1990) (quoting *Gregg v. Georgia*, 428 U.S. 153, 189, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (joint opinion of Stewart, Powell, and STEVENS, JJ.))). In addition the State must "channel the sentencer's discretion by clear and objective standards that provide

specific and detailed guidance, and that make rationally reviewable the process for imposing a sentence of death." *Jeffers*, 497 U.S. at 774, 110 S.Ct. 3092 (quoting *Godfrey v. Georgia*, 446 U.S. 420, 428, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980) (plurality opinion)). It is also well established that the objective standards must narrow the class of people eligible for the death penalty. *See Jeffers*, 497 U.S. at 776, 110 S.Ct. 3092; *see also Zant v. Stephens*, 462 U.S. 862, 877, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983).

In Idaho, the legislature has attempted to satisfy the requirements of the Eighth and Fourteenth Amendment through the adoption of I.C. § 19–2515. This statute attempts to channel the sentencer's discretion by requiring that the sentencing judge, after receiving evidence and argument in aggravation and mitigation, not impose a sentence of death unless at least one of the ten statutorily-identified aggravating circumstances is found to exist beyond a reasonable doubt, and that each aggravating factor found, considered individually, outweighs all of the mitigating circumstances, considered collectively. I.C. § 19–2515(e)–(h).

The adequacy of statutory aggravating factors in establishing clear and objective criteria for limiting the sentencer's discretion has been closely scrutinized by both state and federal appellate courts. In *Walton v. Arizona*, 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990), the Supreme Court outlined federal review of aggravating factors as follows:

> When a federal court is asked to review a state court's application of an individual statutory aggravating or mitigating circumstance in a particular case, it must first determine whether the statutory language is itself too vague to provide any guidance to the sentencer. If so, them the federal court must attempt to determine whether the state courts have further defined the vague terms and, if they have done so, whether those definitions are constitutionally sufficient,

*i.e.*, whether they provide *some* guidance to the sentencer. *Walton*, 497 U.S. at 654, 110 S.Ct. 3047. The heinous aggravating factor, delineated in I.C. § 19–2515(h)(5) and relied upon by the sentencing court in this case, has been scrutinized under this standard and found wanting. In *Maynard v. Cartwright*, 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988), the United States Supreme Court found that the "especially heinous, atrocious, or cruel" aggravating factor was too vague, on its face, to provide the required guidance for the sentencer, so that it will only pass constitutional muster if appropriately delimited by the state courts. However, the respondent argues that the facial invalidity of the "especially heinous, atrocious, or cruel" aggravating factor, is overcome by the limiting construction supplied by the Idaho Supreme Court in *State v. Osborn*, 102 Idaho 405, 631 P.2d 187 (1981). In *Osborn*, the court held that in order to apply the heinous aggravating factor, "the murder must be accompanied by acts setting it apart from the norm of murders and that its commission manifests such depravity as to offend all standards of morality and intelligence." *Osborn*, 102 Idaho at 419, 631 P.2d 187.

Relying upon the *per curiam* decision of the United States Supreme Court in *Shell v. Mississippi*, 498 U.S. 1, 111 S.Ct. 313, 112 L.Ed.2d 1 (1990), the petitioner contends that the *Osborn* decision does not appropriately narrow the heinous aggravating factor. In *Shell*, the Court remanded a petitioner's death sentence for resentenc-ing because the limiting instruction given to the sentencing jury in an attempt to clarify the "especially heinous, atrocious, or cruel" aggravating factor was not constitutionally sufficient. *Id.* The limiting instruction found by the Court to be inadequate advised the sentencing jury that, "the word heinous means extremely wicked or shockingly evil; atrocious means outrageously wicked and vile; and cruel means designed to inflict a high degree of pain with indifference to, or even enjoyment of[,] the suffering of others." *Id.*, 498 U.S. at 2, 111 S.Ct. 313. While it is true that the limiting guidelines of *Osborn* contain many of the definitions of the instruction found to be inadequate in *Shell*, the decision in *Osborn* further restricted the application of I.C. § 19–2515(g)(5) to those cases "where the actual commission of the capital felony was *accompanied by such additional acts* as to set the crime apart from the norm of capital felonies— the *conscienceless or pitiless crime which is unnecessarily torturous to the victim.*" *Osborn*, 102 Idaho at 418, 631 P.2d 187 (emphasis added). This language has been found by the United States Supreme Court to provide adequate guidance to the sentencing court applying the heinous aggravating factor. *Proffitt v. Florida*, 428 U.S. 242, 255–56, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976). Thus, the limiting construction of the "especially heinous, atrocious, or cruel" aggravating factor provided by the Idaho Supreme Court in *Osborn* is clearly distinguishable from the limiting jury instruction found inadequate in *Shell*.[3]

---

3. The *Shell* decision is distinguishable for another reason. In *Shell*, the limiting construction of the statutory aggravating factor found to be inadequate was contained in a jury instruction, since the decision whether to impose the death penalty in Mississippi is made by the jury. In Idaho, the state district court is charged with that responsibility. As the Supreme Court explained in *Walton*, that is a critical distinction:

> Where a jury is the final sentencer, it is essential that the jurors be properly instructed regarding all facts of the sentencing process. It is not enough to instruct the jury in the bare terms of an aggravating circumstance that is unconstitutionally vague on its face. That is the import of our holdings in *Maynard* and *Godfrey*. But the logic of those cases has no place in the context of sentencing by a trial judge. Trial judges are presumed to know the law and to apply it in making their decisions. If the Arizona Supreme Court has narrowed the definition of the "especially heinous, cruel or depraved" aggravating circumstance, we presume that Arizona trial judges are applying the narrower definition. It is irrelevant that the statute itself may not narrow the construction of that factor.

*Walton*, 497 U.S. at 653–54, 110 S.Ct. 3047.

■ The petitioner makes the further argument that, based on an analysis of Idaho cases in which the heinous aggravating factor was applied by sentencing courts, it is evident that the limiting construction provided in *Osborn* is inadequate because of its inconsistent application. However, such a case-by-case analysis of Idaho cases to determine whether the *Osborn* limiting construction has been consistently applied is not within the purview of this Court. In *Arave v. Creech*, the United States Supreme Court held that "a federal court may consider state court *formulations* of a limiting construction to ensure that they are consistent. But our decisions do not authorize review of state court cases to determine whether a limiting construction has been *applied* consistently." *Creech*, 507 U.S. at 477, 113 S.Ct. 1534. At the heart of this view is the acknowledgment that whether a state trial court has properly applied the decisions of a state appellate court which construe and apply a state statute is fundamentally a question of state law. It is well established that federal habeas relief does not lie for errors of state law. *Jeffers*, 497 U.S. at 780, 110 S.Ct. 3092 (habeas review of the state court's application of a constitutionally narrowed aggravating factor is limited to determine whether the state court finding was arbitrary or capricious so as to constitute an independent due process violation). The petitioner's argument appears to be an invitation for the Court to engage in just such an improper review of whether the Idaho trial courts have properly applied the *Osborn* limiting construction. The petitioner has not shown that the limiting construction of the aggravating factor is unconstitutional, and this Court is therefore required, under *Walton*, to presume that the trial court applied this factor in accordance with the language of the narrowing construction of the "especially heinous, atrocious or cruel" aggravating factor.

Finally, the petitioner contends that this Court should not rely upon the *Osborn* decision's limiting construction of I.C. § 19–2515(h)(5), because of its reliance upon *State v. Simants*, 197 Neb. 549, 250 N.W.2d 881 (1977), a decision of the Nebraska Supreme Court since called into question by the Eighth Circuit Court of Appeals in *Moore v. Clarke*, 904 F.2d 1226 (8th Cir.1990). However, the Court is not persuaded that the *Moore* decision creates any serious question as to the continuing vitality of *Osborn*.

In *Osborn*, the Idaho Supreme Court, recognized that the statutory aggravating factor stated in I.C. § 19–2515(h)(5) contained two concurrent requirements. First, the statute requires that the murder have been "especially heinous, atrocious or cruel." Second, the statute also requires that the murder have "manifested exceptional depravity." In trying to place a limiting construction upon the statutory aggravating factor embodied in I.C. § 19–2515(h)(5), the Court looked first to the Florida Supreme Court's construction of the "especially heinous, atrocious or cruel" language in *State v. Dixon*, 283 So.2d 1 (Fla.1973), and adopted the following language from that decision:

> It is our interpretation that heinous means extremely wicked or shockingly evil; that atrocious means outrageously wicked and vile; and that cruel means designed to inflict a high degree of pain with utter indifference to, or even enjoyment of, the suffering of others. What is intended to be included are those capital crimes where the actual commission of the capital felony was accompanied by such additional acts as to set the crime apart from the norm of capital felonies— the conscienceless or pitiless crime which is unnecessarily torturous to the victim.

*Osborn*, 102 Idaho at 418, 631 P.2d 187 (quoting *Dixon*, 283 So.2d at 9). In adopting this definition of "heinous, atrocious, or cruel," the Idaho Supreme Court also noted that this limiting construction was approved by the United States Supreme Court in *Proffitt v. Florida*, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976).

In attempting to define "exceptional depravity," the Court in *Osborn* then turned to the *Simants* decision. In *Simants,* the Nebraska Supreme Court confronted a statutory aggravating factor which required that the murder have "manifested exceptional depravity by ordinary standards of morality and intelligence." Finding a parallel between that language and the "exceptional depravity" language of the Idaho statute, the Court in *Osborn* adopted the following explanation from the *Simants* decision:

> In interpreting this portion of the statute, the key word is "exceptional." It might be argued that every murder involves depravity. The use of the word "exceptional," however, confines it only to those situations where depravity is apparent to such an extent as to obviously offend all standards of morality and intelligence.

*Osborn,* 102 Idaho at 418, 631 P.2d 187 (quoting *Simants,* 250 N.W.2d at 891).

The petitioner is correct in asserting that the *Moore* decision clearly calls into question the *Simants* decision which the Idaho Supreme Court relied upon in *Osborn.* In *Moore,* the Eighth Circuit Court of Appeals looked at the limiting construction adopted by the Nebraska Supreme Court, including the decision in *Simants,* and held that "the body of law developed by the Nebraska Supreme Court construing the challenged statute provides insufficient guidance to the sentencing body called upon to determine whether a particular murder 'manifested exceptional depravity.'" *Moore,* 904 F.2d at 1233. However, the *Moore* decision does not have the same effect on the decision of the Idaho Supreme Court in *Osborn.*

As noted above, the *Osborn* court relied upon *Simants,* not to construe the entire provision of the I.C. § 19–2515(h)(5) aggravating factor, but only to explain and interpret that portion of the statute which required that the murder "manifest exceptional depravity." While the *Simants* construction of the "manifesting exceptional depravity" may be inadequate to pass constitutional muster when applied to that language, standing alone as an aggravating factor, it is not inadequate when applied to similar language which makes up only one part of an aggravating factor. This is particularly so, when the balance of the language employed in the statutory aggravating factor—that the murder be heinous, atrocious, or cruel—has been defined and limited by the Idaho Supreme Court in language which has been found by the United States Supreme Court to provide adequate guidance to the sentencing court. For this reason, the Court declines the petitioner's invitation to strike down the limiting construction in *Osborn,* based upon the decision of the Eighth Circuit in *Moore.*

In summary, the petitioner has not shown that the limiting construction of the "heinous, atrocious or cruel, manifesting exceptional depravity" aggravating factor provided in *Osborn* is inadequate to provide adequate guidance to the sentencing court and avoid the arbitrary imposition of the death penalty. The Court is persuaded that the *Osborn* limiting construction is distinguishable from the limiting construction rejected by the United States Supreme Court in *Shell.* The Court also rejects the petitioner's argument that the limiting construction provided in *Osborn* is inadequate because of its inconsistent application. Finally, the Court does not accept petitioner's argument that *Osborn* has in some way been overturned or called into question by the Eighth Circuit's decision in *Moore.* For all of these reasons, the Court concludes that the petitioner's challenge to I.C. § 19–2515(h)(5) must be rejected.

## 2. Claim B

■ The petitioner alleges that the trial court violated his due process rights by failing to authorize funds for a psychiatrist during the post-conviction proceeding. On December 8, 1989, during the state court proceedings on his second Amended Petition for Post–Conviction Relief, the peti-

tioner filed a motion with the court for the appointment of a psychiatrist to assist in developing issues on post-conviction relief. The trial court held a hearing on the petition, and denied the motion for appointment of a psychiatrist by written order dated December 13, 1989. In the decision, the trial court noted that it appeared the petitioner was seeking the appointment of a psychiatrist to pursue the assertion that he lacked capacity to understand the proceedings. The trial court further stated:

> [T]here was no indication, either by motion or otherwise, that there was any problem with Hoffman's ability to perceive and understand the proceedings. At the sentencing hearing, and again at his post-conviction relief hearing, Hoffman was not only articulate but also perceptive. He also had a good memory of the events of the killing and of the trial. The court also has reviewed the medical records and the report of Dave Sanford, Ph.D. of his examination of Hoffman prior to the sentencing hearing. While Hoffman is semi-illiterate he does not appear to lack the capacity to understand and participate in the proceedings.

*Post–Conviction Relief Record, pp. 88–89.* The petitioner's claim was subsequently rejected by the Idaho Supreme Court, which found that the record supported the trial court's determination that there was nothing in Dr. Sanford's report to suggest there was a problem with the petitioner's ability to perceive and understand the proceedings. The petitioner alleges that the report of Dr. Sanford indicated a neurological deficit which merited exploration prior to the decision on the post-conviction relief petition.

The petitioner contends that under the Supreme Court decision in *Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), he was entitled to the assistance of a psychiatrist during the proceedings on his post-conviction relief petition. In *Ake*, the court held that "when the state has made the defendant's mental condition relevant to his criminal culpability and to the punishment he might suffer,

the assistance of a psychiatrist may well be crucial to the defendant's ability to martial his defense." *Ake*, 470 U.S. at 80, 105 S.Ct. 1087. Petitioner's reliance upon *Ake* is misplaced for a number of reasons. First, *Ake* does not require that a psychiatrist and/or a psychologist be appointed in every criminal case. Such an appointment is necessary only where the state has made the defendant's mental condition a relevant issue, or the defendant has otherwise made a preliminary showing that his mental state will be a serious issue in the proceeding. *See Ake*, 470 U.S. at 83, 105 S.Ct. 1087; *Williams v. Calderon*, 52 F.3d 1465, 1473 (9th Cir.1995) Here, both the state trial court and the Idaho Supreme Court found that there was nothing in the record to support a conclusion that there were psychiatrist or psychological issues present in the case which would require that the petitioner be provided the assistance of a psychiatrist or psychologist in developing such issues as part of his petition for post-conviction relief. From this Court's independent review of the record, it appears that this factual determination is fairly supported by the record. 28 U.S.C. § 2254(d)(8) (West 1995).

■ Second, even if the petitioner had made the requisite showing that his mental state was a serious issue in his post-conviction relief proceeding, the indigent's right to psychiatric assistance has never been extended beyond the trial and sentencing level to include post-conviction relief proceedings. The petitioner has not cited, and the Court's independent review fails to disclose, a single case which so extends the right to expert psychological or psychiatric assistance under *Ake*. Moreover, such an extension of *Ake* would seem wholly inconsistent with the Supreme Court's holding that, because state collateral proceedings serve a different and more limited purpose than either trial or appeal, there is no constitutional right to appointed counsel for capital indigent prisoners pursuing state post-conviction relief proceedings. *See Murray v. Giarratano*, 492 U.S. 1, 7–

10, 109 S.Ct. 2765, 106 L.Ed.2d 1 (1989). For these reasons, the Court declines the petitioner's invitation to extend the holding of *Ake* to post-conviction relief proceedings.

■ Third, the extension of *Ake* to post-conviction relief proceedings in this case would violate the holding of *Teague v. Lane,* 489 U.S. 288, 310, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989) (plurality opinion), that a new rule of constitutional law cannot normally be announced or applied on collateral habeas review. A decision announces a new rule if the result was not dictated by precedent existing at the time the defendant's conviction became final. *Id.* at 301, 109 S.Ct. 1060. Given the dearth of case law supporting the petitioner's argument that *Ake* should be extended to state post-conviction relief proceedings, it is clear that the holding urged by the petitioner would constitute a new rule. While *Teague* does recognize two limited exceptions, neither apply here.[4] Accordingly, the petitioner's argument, even if correct, cannot be applied in this case.

■ Without abandoning his argument under *Ake,* the petitioner contends that two Idaho statutes, I.C. § 19–852[5] and I.C. § 19–4904,[6] guaranteed him court-appointed psychological or psychiatric expert during his post-conviction relief proceeding. However, as previously noted, the trial court considered the petitioner's request, and determined that he had not made an adequate showing that such assistance was necessary. That decision was affirmed by the Idaho Supreme Court and, as discussed above, appears to be supported by the record. The Court can only ignore that finding, if the statutes can be construed to require the appointment of such expert assistance without a showing of necessity. The statutes in question simply do not lend themselves to such a broad reading.

■ Even if the Court were to accept the petitioner's expansive view of his statutory right to court-appointed experts, the inherent difficulty with the petitioner's argument is that a petitioner may not obtain federal habeas relief for errors of state law. *Jeffers,* 497 U.S. at 780, 110 S.Ct. 3092. If the state trial court misapplied I.C. §§ 19–852 and 19–4904, the petitioner must look to the state appellate court for relief. Apparently cognizant of this limitation, the petitioner argues that this denial of his state statutory right to a court-appointed psychiatrist in post-conviction relief proceedings is properly pursued in a federal habeas petition because the stat-

4. The first "limited" exception to *Teague* applies to new rules "forbidding criminal punishment of certain primary conduct [and] rules prohibiting a certain category of punishment for a class defendants because of their status or offense." *O'Dell v. Netherland,* 521 U.S. 151, ——, 117 S.Ct. 1969, 1973, 138 L.Ed.2d 351 (1997) (quoting *Penry v. Lynaugh,* 492 U.S. 302, 330, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989)). The second, "even more circumscribed," exception applies to "watershed rules of criminal procedure implicating the fundamental fairness and accuracy of the criminal proceeding." *Id.* (quoting *Graham v. Collins,* 506 U.S. 461, 478, 113 S.Ct. 892, 122 L.Ed.2d 260 (1993)). The extension of *Ake* to post-conviction relief proceedings does not fall within either exception. *See Chaney v. Stewart,* 156 F.3d 921, 924 (9th Cir.1998).

5. The statute reads as follows:

 Right to counsel of needy person—

 (a) A needy person who . . . is being detained under a conviction of, a serious crime, is entitled:

 (2) to be provided with the necessary services and facilities of representation (including investigation and other preparation).

 I.C. § 19–852.

6. Although since amended, § 19–4904 provided, at the time of petitioner's post-conviction relief proceeding, that:

 [i]f the applicant is unable to pay court costs and expenses of representation, including stenographic, printing, witness fees and expenses, and legal services, these costs and expenses, and a court-appointed attorney shall be made available to the applicant in the preparation of the application, in the trial court, and on appeal, and paid, on order of the district court, by the county in which the application is filed.

 I.C. § 19–4904 (1967).

utes create a constitutionally-protected liberty interest of which he has been arbitrarily deprived by the state trial· court's interpretation of the statute. *Hicks v. Oklahoma,* 447 U.S. 343, 345, 100 S.Ct. 2227, 65 L.Ed.2d 175 (1980). However, the petitioner's argument. necessarily requires a finding that the state trial court acted arbitrarily in interpreting the relevant statutes to require a showing of necessity before the petitioner was entitled to a court-appointed psychiatrist. This Court sees no indication of arbitrariness in the state trial court's interpretation and application of the statutes. Certainly that view of the statutes does not suggest that the trial court flouted Idaho's substantive law in violation of the petitioner's Fourteenth Amendment rights.

In summary, the Court rejects Claim B for a number of reasons. The state court appropriately found that the petitioner had not made the requisite showing, under *Ake,* of a need for the assistance of a mental health expert. Even if such a showing had been made, the holding in *Ake* has never been extended to post-conviction relief proceedings, and to do so in this case would violate the accepted principle that a new rule of constitutional law cannot be announced or applied in a habeas proceeding. Finally, the Court is unpersuaded that the trial court misapplied the provisions of I.C. §§ 19–852 and 19–4904 in denying his request for the assistance of a court-appointed· expert witness. Even if the state court's interpretation of those statutes is in error, that interpretation does not constitute such an arbitrary deprivation of the petitioner's statutory right as to violate his due process rights under the Fourteenth Amendment. For these reasons, the Court concludes that the petitioner is not entitled to habeas relief under Claim B.

**4. Claim C**

▇ The· petitioner, in Claim C, alleges that the state trial court deprived him of his constitutional rights under the Fifth, Sixth, Eighth and Fourteenth Amendments by failing to allow his counsel to be present for the pre-sentence interview. This claim was not raised on direct appeal or in the appeal of the denial of his post-conviction relief petition before the Idaho Supreme Court. Normally, this would require the dismissal of this claim as. being procedurally defaulted. .However, the Ninth Circuit Court of Appeals, in *Beam v. Paskett,* 3 F.3d 1301, 1306–07 (9th Cir. 1993), determined that because Idaho's death penalty statute provides for a mandatory review· by the Idaho Supreme Court of the entire record for possible errors in sentencing, all such errors. are considered to· have been implicitly raised before the state court on appeal and, thus, not procedurally defaulted. This Court has previously ruled that Claim C raises a *Beam* type claim which must be considered on the merits. ·

The petitioner's argument depends heavily, if not exclusively, upon the Supreme Court's· decision in *Estelle v. Smith,* 451 U.S. 454, 101 S.Ct. 1866, 68· L.Ed.2d 359 (1981). Because the success of petitioner's argument depends upon whether the facts of *Estelle,* are analogous to those presented here, an extensive discussion of that case is necessary. In *Estelle,* a Texas trial court, sua sponte, ordered that a defendant facing capital murder charges undergo a psychiatric examination to establish his competency to stand trial. The defendant was found to be competent, and, following a ·jury trial, was convicted. As required by Texas law, a·separate proceeding was then undertaken before the same jury to consider whether the defendant should receive the death penalty. At the sentencing hearing, the state offered the testimony of the court-appointed psychiatrist, who had interviewed the defendant solely for competency purposes, to establish the defendant's future dangerousness, which was a condition precedent to the imposition of the death penalty under·Texas law. .The psychiatrist testified that the defendant was a psychopath with no remorse for what he had done, and that, in essence, the defendant would be a dangerous threat to society in· the future if not

executed. Relying on this testimony, the jury imposed the death penalty. *See Estelle v. Smith*, 451 U.S. at 456–60, 101 S.Ct. 1866.

On review, the Supreme Court concluded that the state's use of the psychiatrist's testimony violated the defendant's Fifth, Sixth, and Fourteenth Amendment rights. Limiting its inquiry to "the circumstances of the case," *id.* at 461, 101 S.Ct. 1866, the Court found that the question of dangerousness was a "critical issue at the sentencing hearing and one on which the State had the burden of proof beyond a reasonable doubt." *Id.* at 466, 101 S.Ct. 1866. Under these circumstances, the defendant's Fifth Amendment privilege and Sixth Amendment right to counsel were implicated so that he should have received a *Miranda* warning prior to the psychiatrist's interview, *id.* at 467, 101 S.Ct. 1866, and the state should have forewarned the defendant's attorney that the competency examination would encompass issues which may be critical at the sentencing phase of the aggregate proceedings. *Id.* at 470–71, 101 S.Ct. 1866. These shortcomings denied the defendant of his right to "the guiding hand of counsel," in "making the significant decision of whether to submit to the examination and to what end the psychiatrist's findings could be employed." *Id.* at 471, 101 S.Ct. 1866

The petitioner argues that the rationale of *Estelle* applies with equal force where a defendant in a capital case is denied access to counsel during an interview conducted by a probation officer for the purpose of preparing a presentence report. The Ninth Circuit Court of Appeals provided some guidance on this issue in *Baumann v. United States*, 692 F.2d 565 (9th Cir. 1982) and *United States v. Benlian*, 63 F.3d 824 (9th Cir.1995).

In *Baumann*, a non-capital case, the defendant relied on *Estelle* in arguing that it was a violation of his Sixth Amendment right to counsel to be interviewed at a presentence interview without counsel when inferences drawn by the interviewer were provided to and relied upon by the court in imposing its sentence. The court of appeals concluded, however, that while the interview constituted interrogation under *Miranda*, and assumed that the petitioner was in custody at the time of the interview, "neither *Estelle* itself, nor the general principles announced in *Miranda*, require that a convicted defendant be warned of his right to counsel and his right to remain silent prior to submitting to a routine, authorized presentence interview." *Baumann*, 692 F.2d at 576. The court of appeals also rejected his argument that he was deprived of his Sixth Amendment right to counsel and concluded that *Estelle* was distinguishable:

> We understand the sixth amendment portion of *Estelle*, therefore, to be consistent with the general principle that the right to counsel attaches upon the commencement of adversary proceedings and applies to any critical stage of those proceedings where counsel's absence, or lack of advice, might derogate from the accused's right to a fair trial. Clearly, denying the defendant in *Estelle* the assistance of counsel with respect to his responses to questions that would be used in order to prove, beyond a reasonable doubt, the critical aggravating factor of dangerousness, impaired the fairness of the jury trial itself.... Thus, the Court was justified in concluding that the defendant's "interview proved to be a 'critical stage' of the aggregate proceedings against [him]." 451 U.S. at 470, 101 S.Ct. 1866.

Because the sentencing phase of the non-capital case before us does not involve an issue which is nearly as critical as was the issue of dangerousness in *Estelle*, the presentence interview was not a "critical stage" of the aggregate proceedings against Baumann.... [A]lthough Baumann may have been denied the advice of his attorney in making the "significant decision of whether to submit to the [interview]," *Estelle*, 451 U.S. at 470, 101 S.Ct. 1866, any such denial was constitutionally insignificant. We hold that a routine presentence inter-

view of an individual convicted of a non-capital federal offense is not ... a critical stage of the proceeding in which counsel's presence, or advice, is necessary to protect the defendant's right to a fair trial.

*Id.,* at 577–78. (citations omitted).

In *Benlian,* the court of appeals reiterated the standard set out in *Baumann* that a violation of the Sixth Amendment only occurs if the deprivation of counsel occurred at a critical stage in the proceedings. *Benlian,* 63 F.3d at 827. The court further noted that every other Circuit to have confronted the question rejected the notion that the presentence interview constitutes a critical stage in the adversary proceedings. *Id.*

Neither *Estelle* nor the Ninth Circuit Court of Appeals decisions in *Baumann* and *Benlian* are dispositive. *Estelle* dealt with a pre-trial psychiatric examination subsequently used in a capital sentencing hearing, rather than a presentence interview. *Baumann* and *Benlian* involved presentence interviews, and both declined to extend the *Estelle* decision to such interviews and examinations. However, neither case involved the death penalty; indeed, the court in *Baumann* unequivocally indicated that the non-capital nature of the sentencing in question was one reason which distinguished that case from *Estelle. Baumann,* 692 F.2d at 576. Nor can one assume that because the court in *Baumann* distinguished *Estelle* on this basis, that *Estelle* governs all instances where a probation officer conducts an interview as part of his or her preparation of a presentence report in a death penalty case. *See Williams v. Chrans,* 945 F.2d 926, 953 n. 46 (7th Cir.1991). Since the Supreme Court in *Estelle* specifically limited its inquiry to "the circumstances of th[e] case," *Estelle v. Smith,* 451 U.S. at 461, 101 S.Ct. 1866, and made clear that the same Fifth and Sixth Amendment concerns are not "necessarily presented by all types of interviews and examinations that might be

ordered or relied upon to inform a sentencing determination," *id.* at 469, n. 13, 101 S.Ct. 1866, it would appear that the circumstances of each presentence interview must be considered, and compared to the circumstances confronted in *Estelle,* to determine whether it constitutes a "critical stage" of the proceedings to which the holding of that case applies. A review of the circumstances of the presentence interview here, persuades the Court that it was not a "critical stage" of the proceedings, and that the deprivation of counsel during the interview did not violate the petitioner's constitutional rights.

A myriad of factors clearly distinguish this case from *Estelle.* First, and perhaps most significantly, the presentence report here, unlike the psychiatrist's testimony in *Estelle,* did not include a critical finding or recommendation upon which the decision to impose the death penalty was based.[7] In reviewing the transcript of the sentencing hearing, it is clear that the trial court relied on two aggravating factors in imposing the death sentence; (1) the victim was a witness, and (2) the circumstances surrounding the murder were heinous, atrocious and cruel. Neither of these determinations were based upon matters contained in the presentence report, but were based upon testimony presented during the trial and during the sentencing hearing, specifically the details of the murder supplied by Ronald Wages. Indeed, during the sentencing hearing, the trial court described the presentence report as containing "nothing startling or new." *Trial Transcript, Vol. IX, p.1969.* By comparison, the psychiatrist's testimony at the sentencing hearing in *Estelle* provided the critical evidence necessary to support the finding of dangerousness which was a condition precedent to the imposition of the death penalty.

Second, the defendant here took the witness stand during the sentencing hearing and related to the trial court virtually the

7. The Pre–Sentence Investigator made a general recommendation that the petitioner receive the maximum penalty, but did not mention the death penalty.

same information which he disclosed during the presentence interview. The petitioner's testimony was extensive and was subject to rigorous cross-examination. He was given the opportunity to discuss every statement made to the presentence investigator. While this would not be a significant distinguishing factor if the petitioner was forced to testify to rebut or respond to statements attributed to him in the presentence report, the petitioner has not shown that to be the case here.

Third, unlike the circumstances confronted by the Supreme Court in *Estelle,* there was no uncertainty as to the purpose of the presentence interview in this case. Idaho law requires that a presentence investigation be conducted in all cases in which the death penalty may be imposed. I.C. § 19–2515(e); *State v. Creech,* 105 Idaho 362, 670 P.2d 463 (1983). Presentence reports under Idaho law typically would include an inquiry into the circumstances of the offense, as well as the defendant's criminal record, social history and present condition. I.C. § 20–220. Thus, when the trial judge ordered a presentence investigation in this case, there was no uncertainty as to the scope of, or the purpose for, the presentence investigator's interview of the petitioner. By comparison, the psychiatric interview in *Estelle* was originally conducted to determine the defendant's competency to stand trial, and was only later used as the basis for the psychiatrist's testimony at the sentencing hearing. The Supreme Court placed great weight on the fact that neither the defendant nor his attorney were given any indication that the compulsory examination would be used to gather evidence necessary to decide whether, if convicted, the defendant would be sentenced to death. The Court also emphasized the role which counsel could have played in limiting the purpose for which the evaluation could be used in those circumstances, noting that "the [defendant] was denied the assistance of his attorneys in making the significant decision of whether to submit to the examination and to what end the psychiatrist's findings could be employed." *Estelle,* 451

U.S. at 471, 101 S.Ct. 1866. Given, the clearly-defined, and well-understood, role of the presentence report in this case, counsel would not have played a similar critical role in the presentence interview of the petitioner.

Fourth, the presentence investigator in this case had a clearly-defined role as a fact gatherer for the court. By comparison, the Supreme Court in *Estelle,* characterized the psychiatrist as "an agent of the State recounting unwarned statements made in a post-arrest custodial setting." *Id.* at 467, 101 S.Ct. 1866. The Court based this characterization on the psychiatrist's going beyond the role originally set at the time of the competency examination and assuming a prosecutorial role in the sentencing phase of the jury trial. *See id.* Here, no such unexpected role shifting occurred. The probation officer fulfilled one role—that of an impartial fact-gatherer for the trial court. The presentence investigator did not testify at the sentencing hearing, but was certainly available to both the prosecution and the defense, and could have been extensively examined as to the accuracy of his or her factual observations.

Finally, the circumstances of the presentence interview clearly distinguish this case from *Estelle.* Here, the trial court specifically admonished the Deputy Attorney General to inform the presentence investigator to advise the petitioner that he was not required to answer his questions, and that the petitioner could exercise his Fifth Amendment right to remain silent. *Clerk's Record, p. 1425.* The record indicates that the petitioner understood this, since he exercised his right to remain silent and refused to answer some of the presentence investigator's questions. *Trial Transcript, Vol. IX, p.1972.* The trial court also directed that the presentence interview be tape recorded and that a copy be provided to counsel. *Clerk's Record, p. 1425.* This was done and, although petitioner's counsel objected to the timeliness of the disclosure, the record indicates that he did review the tape prior to the sen-

tencing and had no objections to the matters covered by the investigator or the disclosures made by the petitioner. *Trial Transcript, Vol. IX, pp.1966–1967.* Thus, while counsel may play a critical role during some presentence interviews, there is no indication from the record that the interview was conducted in a way which would have required that the petitioner be provided with counsel to safeguard his rights.

In summary, the Court concludes that the circumstances of these proceedings are clearly distinguishable from the situation in *Estelle*, which caused the Supreme Court to determine that the competency interview in that case was a "critical stage" of the proceedings during which the defendant was entitled to his Miranda warnings and to the assistance of counsel. Without suggesting that a presentence interview can never constitute a "critical stage" in the imposition of the death penalty, the Court concludes that the presentence interview conducted in this case was not so critical to the proceedings as to trigger the petitioner's rights under the Fifth, Sixth, and Fourteenth Amendments.

### 5. Claim G

The petitioner claims that the trial court imposed the death penalty relying on an improper finding and failed to find that the petitioner killed, attempted to kill, intended to kill or acted with reckless indifference. The petitioner alleges that this constitutes a violation of the Eighth and Fourteenth Amendments as interpreted and applied by the Supreme Court in *Tison v. Arizona*, 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987). The Court is unpersuaded.

At sentencing the trial court made the following finding:

The defendant did willfully participate in the killing of Denise Williams. The defendant intentionally inflicted wounds on Denise Williams, by slashing her throat, that would have cause [sic] her death without immediate medical attention. The wounds were inflicted by the defendant with the intention of killing her.

*Findings of the trial court, Clerk's Record, p. 1448.* The petitioner alleges this finding, that the slashing of William's throat would have caused the death of the victim, is not supported by the evidence at trial. The petitioner relies on the testimony at trial of pathologist Dr. Thomas Donndelinger who testified regarding the severity of the neck wound. Dr. Donndelinger stated:

Well, from my observation from the tissue that was left, there would be bleeding. If I was to assume that the cut was the same all the way across, you would get in that location, you would get bleeding that would look like a great deal of blood, but would not be likely to allow somebody to bleed to death in a short period of time.

*Trial Transcript, Vol. IV, p. 793.* The petitioner argues that the trial court could not properly find the throat slashing wound would be fatal when the pathologist clearly says it was not. The Court disagrees.

The death penalty is not a disproportionate punishment for those who kill, intend to kill, intend that lethal force be applied, or act with reckless indifference to human life while playing a major role in the felony that results in murder. *Paradis v. Arave*, 20 F.3d at 959 (citing *Enmund v. Florida*, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982); *Tison v. Arizona*, 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987)). In *Enmund* The Supreme Court held that the focus must be on the culpability of the defendant, "not on that of those who committed the robbery and shot the victims, for we insist on 'individualized consideration as a constitutional requirement in imposing the death sentence. . . .'" *Enmund*, 458 U.S. at 798, 102 S.Ct. 3368 (quoting *Lockett v. Ohio*, 438 U.S. 586, 605, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) (footnote omitted)).

The testimony at trial and during sentencing indicated that the petitioner slashed Williams' throat on the orders of Richard Holmes, and left her in a cave, when she later crawled out of the cave covered with blood, Wages stabbed her with a knife in the torso area and both men covered her with a pile of rocks and left her there. Based on this testimony, the trial court specifically found that the petitioner willfully participated in the "killing of Denise Williams and did himself inflict wounds that without the intervention of medical treatment would have caused her death. The wounds were inflicted with the intention that a killing take place." *Trial Transcript, Vol. IX, p. 2179.*[8] Thus, the trial court made a specific finding of culpability which satisfied the requirements of *Enmund.*

The pathologist's testimony was not inconsistent with the trial court's finding. While the pathologist stated that Williams did not die of the throat wound, he did not suggest that she would not ultimately have died from the throat wound. Bleeding profusely from the throat wound, Williams was left by the petitioner in a cave in the middle of the Owyhee County desert, in an area which is characterized by its rugged terrain and isolation. It was certainly not improper for the trial court to conclude from this, that the petitioner killed, attempted to kill, intended to kill or acted with reckless indifference. The petitioner's subsequent conduct in burying Williams under a pile of rocks simply added weight to this conclusion. In summary, the petitioner's claim that the trial court's findings are in conflict with the testimony presented is incorrect.

### 6. Claim I

At trial, the court permitted Samuel Longstreet to testify about certain graphic statements made by Holmes prior to the death of Denice Williams. These included statements by Holmes that Williams was

"dead meat," and that he would make her "bleed to death like an animal." The trial court admitted those statements under Idaho Rule of Evidence 801(d)(2)(E), which provides that a statement by a co-conspirator made during the course and in further of the conspiracy is not hearsay. In admitting the statements, the trial court concluded that Holmes, Longstreet, the petitioner, and others were all co-conspirators in the murder of Williams. The petitioner objected, contending that there was insufficient evidence of the existence of, or his participation in, any conspiracy to commit murder. Petitioner now contends that (1) the evidence was inadequate to support the trial court's finding of the existence of a conspiracy, (2) the admission of Holmes's statements· at trial violated his Sixth Amendment right of confrontation, and (3) the trial court's consideration of such prejudicial and out-of-court statements violated his due process rights. The Court finds the petitioner's arguments to be without merit.

The adequacy of the evidence to support the trial court's finding that Holmes and the petitioner were members of a conspiracy to commit murder was raised by the petitioner in his direct appeal to the Idaho Supreme Court. That court made the following assessment of the evidence tying Hoffman and Holmes to a conspiracy to kill Williams:

> At the time of Hoffman's objection, there was evidence that Holmes was Hoffman's leader and that Hoffman lived at Holmes' residence and worked in Holmes' drug operation. There was also testimony at that time that Hoffman was with Holmes when Wages was dropped off at the Boy Scout Camp. Later testimony established that, acting for Holmes, Hoffman conducted a strip search of Longstreet and Slawson to protect Holmes. It was also established that Hoffman drove Williams to Holmes after she had been kidnaped and that

---

**8.** Pursuant to Idaho statute, the trial court was required to prepare written findings in consideration of aggravation and mitigation. Following argument and testimony on the sentencing issue, the trial court recessed and returned stating its intention to reduce its remarks at sentencing to writing.

Holmes told Hoffman, "You know what to do," when it came time to take Williams away Hoffman had Williams prepare letters exonerating Holmes. Finally, there was evidence that Hoffman told other inmates while he was in jail that he and Holmes had planned to get rid of Williams and that Holmes had offered him $10,000 and some property to kill her.

*Hoffman,* 123 Idaho at 641–42, 851 P.2d 934. From this summary of the trial record, the Idaho Supreme Court concluded that the "evidence clearly supports a finding of a conspiracy of which Hoffman was a member. The trial court did not err in admitting the out-of-court statements of Holmes under I.R.E. 801(d)(2)(E)." *Id.* at 642, 851 P.2d 934. Granting the state court findings the presumption of correctness to which they are entitled under federal habeas review, *Jeffries v. Blodgett,* 5 F.3d 1180 (9th Cir.1993) (en banc), this Court concurs with the Idaho Supreme Court's assessment of the adequacy of the evidence to establish the existence of a conspiracy, and its determination that Holmes's out-of-court statements were thus properly admitted against the petitioner under I.R.E. 801(d)(2)(E).[9]

▮▮▮▮ Turning to the petitioner's contention that the admission of Holmes's statements violated his rights under the confrontation clause of the Sixth Amendment, the Court notes that the admissibility of hearsay statements under the rules of evidence does not automatically satisfy a defendant's constitutional right of confrontation. *Idaho v. Wright,* 497 U.S. 805, 814, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990). Rather, the Supreme Court has set forth "a general approach" for determining when hearsay statements admissible under the hearsay rule also meet the requirements of the Confrontation Clause. First, the prosecution must satisfy a rule of necessity by establishing, in the usual case, the unavailability of the declarant whose statements it wishes to use against the defendant. *Id.* Second, if the declarant is shown to be unavailable, his or her statement is admissible if it bears an adequate indicia of reliability. *Id.* at 814–15, 110 S.Ct. 3139. In applying this general analytical framework, however, the Supreme Court has consistently and clearly held that out-of-court statements made by a non-testifying co-conspirator may be admitted without violating a defendant's right of confrontation In such circumstances, the general requirement of unavailability does not apply, *id.; United States v. Inadi,* 475 U.S. 387, 394–400, 106 S.Ct. 1121, 89 L.Ed.2d 390 (1986), and such statements satisfy the reliability requirement because the hearsay exception for co-conspirator statements is a firmly rooted one. *Wright,* 497 U.S. at 815, 110 S.Ct. 3139; *Bourjaily v. United States,* 483 U.S. 171, 182–84, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987). Given the clarity of the Supreme Court's holdings, there can be no question but that the admission of Holmes's out-of-court statements did not violate the petitioner's Sixth Amendment right of confrontation.[10]

---

9. The petitioner also contended that even if there was evidence which supported the trial court's finding of a conspiracy among Holmes, the petitioner, and others to murder Denice Williams, that evidence established that the petitioner did not enter the conspiracy until after Holmes had made the statements attributed to him by Longstreet. However, as the Idaho Supreme Court noted, it is not necessary that the petitioner have been a part of the conspiracy at the time the statements were made. *Hoffman,* 123 Idaho at 642, 851 P.2d 934; *United States v. Mkhsian,* 5 F.3d 1306, 1312 (9th Cir.1993), *overruled on other grounds,* (quoting *United States v. Anderson,* 532 F.2d 1218, 1230 (9th Cir.1976))

(statements of co-conspirators are not hearsay, even if made prior to the entry into the conspiracy by the party against whom it is offered).

10. The petitioner's reliance upon *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), and *Smith v. Illinois,* 390 U.S. 129, 88 S.Ct. 748, 19 L.Ed.2d 956 (1968) is misplaced. Neither case dealt with the circumstance where a co-conspirator's out-of-court statements were admitted pursuant to Rule 801(d)(2)(E). Rather, *Bruton* dealt with the unique difficulty which arises when two or more codefendants are tried together, and the statement of one defendant is offered into

Finally, the petitioner contends that the admission of Holmes's out-of-court statements deprived him of his right to due process during sentencing, because the court considered those statements in finding the existence of the "heinous, atrocious, and cruel" statutory aggravating circumstance. This Court finds this contention to be unpersuasive.

Petitioner's argument would require that evidence, properly admitted during trial in conformance with the rules of evidence and the defendant's constitutional rights, not be considered by the court in imposing the death penalty. The petitioner cites no cases for this novel proposition,[11] and the Court's own research reveals no cases which provide support for petitioner's argument; rather, the case law supports the opposite conclusion *See Roberts v. United States*, 445 U.S. 552, 556, 100 S.Ct. 1358, 63 L.Ed.2d 622 (1980) (a judge may appropriately conduct an inquiry broad in scope, largely unlimited either as to the kind of information be may consider, or the source from which it came).

Petitioner's argument also fails because the record does not indicate that the trial court relied upon Holmes's out-of-court statements in imposing the death penalty. In pronouncing sentence, the trial court did indicate that it was troubled by Holmes' statements about the manner in which he wanted Williams killed. However, his final comments make clear that he found the "heinous, atrocious, and cruel" aggravating circumstance because of the manner in which the murder was committed rather than the statements attributed to Holmes:

> Whatever the reason for the fact, she was allowed to bleed to death, to crawl quite a ways, crawl up the side of a hill still alive, asking people to kill her. Her

death was atrocious, cruel and unusual death and it does prove unusual depravity on the part of the defendant.

*Trial Transcript, Vol. IX, p. 2185.* From these statements, the Court concludes that the trial court's consideration of Holmes's statements at sentencing did not contribute to its decision to impose the death penalty. Thus, any alleged error was harmless.

In summary, the Court concludes that the trial court properly admitted Holmes's out-of-court statements as the statement of a co-conspirator under I.R.E. 801(d)(2)(E). Moreover, the admission of such evidence did not violate the petitioner's Sixth Amendment right of confrontation. The Court also concludes that the trial court did not violate the petitioner's due process rights by improperly considering those statements in imposing the death penalty.

### 6. Claim L

The petitioner alleges the trial court erred in the weighing of aggravating and mitigating evidence in violation of the Fifth, Eighth and Fourteenth Amendments. Specifically, the petitioner contends the trial court erred in three respects: (1) by improperly relying upon the petitioner's specific intent to kill as an aggravating factor, when the intent to kill is the factor that made him eligible for the death penalty, (2) improperly stating that the "defendant's record contains convictions for robbery, battery, kidnaping and murder" when this was the petitioner's only murder conviction, and (3) improperly considering, as a mitigating factor, the victim's father's request that the petitioner not receive the death penalty. Additionally, the petitioner cites to several examples of acts attributed to the petitioner in the

---

evidence and its contents implicate the other defendant as well. The decision of the first defendant not to take the witness stand deprives the implicated defendant of the right to cross examine the maker of the statements and clearly raises serious concerns as to his or her constitutional right of confrontation. In *Smith,* on the other hand, the Supreme

Court concluded that the trial court's restriction on cross examination of a witness deprived the defendant of his Sixth Amendment right to confront his accuser. Neither case resembles the situation at issue here.

11. *Petitioner's Memorandum of Points and Authorities, filed April 9, 1996, pp. 44–45.*

trial court's findings, but which were committed by other persons in the conspiracy. After a review of the relevant case law, this Court is unpersuaded that the petitioner has raised a claim which entitles him to relief.

■■ Initially, this Court notes that a review of the trial transcript indicates that the trial court was particularly careful in pronouncing the death sentence not to "double count" the aggravating factors. At sentencing the trial court explained its consideration of the aggravating and mitigating factors:

> The Supreme Court has indicated that all of these statutory aggravating factors are mutually exclusive. There is no question in my mind that the Defendant by the killing of Denise Williams exhibited an utter disregard for human life. Anybody that would kill somebody just because they are going to be a witness in a case is exhibiting an utter disregard for life. However, I cannot make that finding in this case, I don't think I can made that finding because my finding that there is an utter disregard for human life is based upon the fact he killed a witness and that is a duplication of the one factor which I have already found. So because the statutory factors are mutually exclusive, the Court will not find under (g)(6) as an aggravating factor. Now there is no question in my mind and the Court finds, that the Defendant is a person who is prone to violence. In the past year he has had a battery case, a kidnaping case, and a murder case all of which involved mistreating another human being. The Defendant's life, except for a period of time when he was down in California has been one of constant difficulty with the law. However, again, I'm not able to find this factor present in this case as an aggravating factor. To show he had a propensity to commit murder, I have to look back at the fact he was quite willing to kill a person because she was going to be a witness in a case. For no other reason than that. That is a fact I have already found and I have to find each of these

factors beyond a reasonable doubt, each factor may not duplicate another.

*Trial Transcript, Vol. IX, p. 2188.* Second, a review of the case law indicates that an overlap between elements of the crime and statutory aggravating circumstances is not necessarily a constitutional violation. In *Lowenfield v. Phelps,* 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988), the United States Supreme Court held that an aggravating circumstance duplicating an element of the crime is not constitutionally infirm, so long as the state narrows the class of those persons eligible for the death penalty and considers mitigating circumstances at sentencing. *Id.* at 246, 108 S.Ct. 546. As outlined above, this Court has rejected the petitioner's claim that the statutory aggravating factors fail to narrow the class of persons eligible for the death penalty. Thus, there is no basis the petitioner's claim that an overlap between an element of the crime and one of the statutory aggravating circumstances relied upon by the trial court in imposing the death penalty constitutes a constitutional violation.

The petitioner's second allegation that the trial court improperly stated that the petitioner's record contained a conviction for murder is not supported by the facts. The statement by the trial court was factually correct, since there is no indication that the trial court was referring to a prior murder conviction. Therefore, the petitioner has not shown that the trial court's factual determination is not supported by the record. 28 U.S.C. § 2254(d)(8) (West 1995).

■■ Finally, the Court is unpersuaded by the petitioner's claim that the trial court improperly considered the victim's father's statement that the petitioner not receive the death penalty as a mitigating circumstance. Aside from failing to show how this information, essentially beneficial to the petitioner, is a constitutional violation, evidence about the impact of the murder on the victim's family is unconstitutional only if it is "so unduly prejudicial that it

renders the sentence fundamentally unfair." *Gretzler v. Stewart,* 112 F.3d 992, 1009 (9th Cir.1997) (quoting *Payne v. Tennessee,* 501 U.S. 808, 825, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991)). As the petitioner has not shown the information to be prejudicial, the Court will deny relief on this claim.

In summary, the Court's review of the claim indicates that the trial court carefully weighed the aggravating and mitigating factors as outlined by Idaho law in imposing the petitioner's sentence. The petitioner has failed to support his claim that the trial court duplicated an element of the crime by relying on it as an aggravating factor; in fact, the petitioner has failed to show that such duplication would be a constitutional violation in this instance. Finally, the petitioner has failed to show that the trial court made a factual error or improperly relied upon the victim's father's statement in imposing sentence.

### 7. Claim M

In Claim M, the petitioner makes two related claims concerning the application of the Idaho post-conviction relief statute, I.C. § 19–2719. First, the petitioner alleges that the 42 day time limit for filing post-conviction relief petitions in capital cases deprives him of his rights to due process and equal protection and is a violation of the Sixth and Eighth Amendments. Second, the petitioner alleges that the failure of the district court to appoint him separate conflict-free counsel for his post-conviction claims violated his equal protection and due process rights, because the Idaho Supreme Court has effectively held that ineffective assistance of counsel claims can only be pursued by way of a post-conviction relief petition. The Court will consider each argument in turn.

 Turning first to the petitioner's contention that the 42 day time limit for filing a petition for post-conviction relief in a capital case violates his constitutional rights, the Court notes that the Idaho Supreme Court has repeatedly upheld the 42 day deadline in the face of due process

and equal protection challenges. *See State v. Rhoades,* 120 Idaho 795, 806–07, 820 P.2d 665, 676–77 (1991); *State v. Fetterly,* 115 Idaho 231, 766 P.2d 701 (1988); *State v. Beam,* 115 Idaho 208, 766 P.2d 678 (1988). The same conclusion has been reached in its district. *See Fetterly v. Paskett,* 747 F.Supp. 594 (D.Idaho 1990). After an independent review and consideration of the petitioner's constitutional claims, this Court concurs.

A procedural due process violation is established when a person is deprived of life, liberty, or property interests without adequate procedural protections. *Foss v. National Marine Fisheries Service,* 161 F.3d 584, 588 (9th Cir.1998). Since there is little question that the petitioner's life and liberty interests were at stake in the post-conviction relief proceedings, the adequacy of the procedural protections afforded by I.C. § 19–2719 become the pivotal question in analyzing the petitioner's claim. The adequacy of procedural safeguards must be appraised under a balancing test prescribed by the United States Supreme Court in *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). The *Mathews* test has been recently summarized by the Ninth Circuit as requiring the weighing of three factors: (1) the private interest at stake, (2) the risk of an erroneous deprivation of such interest through the procedures used, as well as the value of additional safeguards, and (3) the Government's interest in maintaining its procedures, including the burdens of additional procedural requirements. *Foss v. National Marine Fisheries Service,* 161 F.3d 584, 588–89 (9th Cir. 1998).

Applying the *Mathews* test to the petitioner's claim, it is clear that his private interest in appropriate procedural safeguards is substantial. Likewise, it is clear that the State of Idaho has a substantial interest in maintaining its expedited procedures for the disposition of death penalty appeals and collateral proceedings without the burden of additional procedural re-

quirements. As the Idaho Supreme Court has noted, "the government's interest in enacting I.C. § 19–2719, stated by the legislature, is 'to accomplish the purpose of eliminating unnecessary delay in carrying out a valid death sentence.' This was determined by this Court to be a legitimate goal in *State v. Beam.*" *Rhoades*, 120 Idaho at 806, 820 P.2d 665. The validity of a state's interest in the orderly and prompt resolution of collateral proceedings in capital cases has also been recognized by the United States Supreme Court. *See Barefoot v. Estelle*, 463 U.S. 880, 892–86, 103 S.Ct. 3383, 77 L.Ed.2d 1090 (1983); *see also Murch v. Mottram*, 409 U.S. 41, 45–46, 93 S.Ct. 71, 34 L.Ed.2d 194 (1972).

Given the competing interests of the petitioner and the respondent in this matter, the resolution of the petitioner's procedural due process claim turns upon the question of whether I.C. § 19–2719 provides an adequate process to prevent an erroneous conviction and imposition of the death penalty. The Idaho Supreme Court summarized the adequacy of the statute in *State v. Rhoades*, 120 Idaho 795, 806, 820 P.2d 665 (1991), as follows:

> The statute requires the defendant to file a petition for post-conviction relief within 42 days of the filing of the judgment imposing the sentence of death. These challenges arise out of the judicial proceeding just concluded. At this point, counsel has been closely involved with the case for some time, has been present at trial, and has had notice of all issues that are appropriate to be raised within this 42 day limit. All that counsel is required to do is to organize all challenges and issues that arose during trial and are appropriate for appeal within 42 days. That is not an unduly burdensome task. The statute provides adequate notice to the defendant of exactly what is required of him, and sufficient opportunity for all challenges to be heard.

The Idaho Supreme Court went on to note that, under its decisions, the statute does not preclude the filing of subsequent petitions for post-conviction relief where the petitioner only learns of facts supporting the subsequent petition after the first petition has been filed. *Id.* at 806–07, 820 P.2d 665. The Court agrees with this assessment. Thus, as interpreted, I.C. § 19–2719 provided the petitioner with an adequate opportunity to present and obtain judicial review for all issues which could properly have been raised in post-conviction relief proceedings. Accordingly, the statute does not violate the petitioner's procedural due process rights.

Turning to the Petitioner's equal protection claim, this claim may be summarized as alleging that I.C. § 19–2719 violates the petitioner's rights under the Equal Protection Clause of the Fourteenth Amendment because it provides non-capital prisoners with five years to file a post-conviction petition, while capital prisoners have only 42 days.[12] *Compare* I.C. § 19–4902 *with* I.C. § 19–2719. In considering this claim, the Court must first consider the appropriate level of scrutiny. A strict scrutiny standard is applied only if the statute discriminates against a suspect class or infringes upon a fundamental right. *Nordlinger v. Hahn*, 505 U.S. 1, 10, 112 S.Ct. 2326, 120 L.Ed.2d 1 (1992); *Rodriguez v. Cook*, 169 F.3d 1176, 1178 (9th Cir.1999); *Madrid v. Gomez*, 150 F.3d 1030, 1040 (9th Cir.1998). Otherwise, the classification is reviewed under the "rational basis test," which asks whether the classification rationally furthers a legitimate government interest. While there is no decision of the U.S. Supreme Court or Ninth Circuit Court of Appeals as to whether capital defendants are a suspect class for equal protection purposes, a decision in this district held that they are not, *Fetterly v. Paskett* 747 F.Supp. 594 (D.Idaho 1990), and that conclusion has also been reached in other circuits which have considered the issue. *Dickerson v. Latessa*, 872 F.2d 1116, 1119 (1st Cir.1989); *Evans v.*

12. In 1993, I.C. § 19–4902 was amended to permit defendants in non-capital cases only one year in which to file their post-conviction relief petition.

**1214**

*Thompson,* 881 F.2d 117, 121 (4th Cir. 1989); *Williams v. Lynaugh,* 814 F.2d 205, 208 (5th Cir.1987); *United States ex rel. Free v. Peters,* 778 F.Supp. 431, 448 (N.D.Ill.1991). It is equally clear that access to post-conviction relief proceedings does not constitute a "fundamental right." Again, the few courts which have considered the issue have concluded that there is no federal constitutional requirement that a state provide post-conviction review of a state conviction. *Williams v. Missouri,* 640 F.2d 140, 143 (8th Cir.1981); *Fetterly,* 747 F.Supp. at 600. The Court concludes that the rational basis test is the appropriate standard for judging the petitioner's equal protection claim.

The 42 day limit imposed by I.C. § 19–2719 bears a clear and rational relationship to the state's interest in the orderly and prompt resolution of collateral proceedings in capital cases. There is a valid distinction between capital and non-capital cases because, "unlike a term of years, a death sentence cannot begin to be carried out by the State while substantial legal issues remain outstanding." *Barefoot v. Estelle,* 463 U.S. at 888, 103 S.Ct. 3383. The Idaho legislature's decision to limit the time frame for pursuing post-conviction relief proceedings is rationally related to this concern, as well as the State's more generalized interest in maintaining respect for its court system, obtaining some measure of finality in its criminal process, and in effectuating an orderly consideration and disposition of challenges to the decisions of its tribunals. For these reasons, the Court rejects the petitioner's contention that I.C. § 19–2719 violates his equal protection rights under the Fourteenth Amendment.

Finally, the Court will address the petitioner's contention that I.C. § 19–2719 effectively precludes him from making a claim that his trial counsel failed to provide him with the effective assistance of counsel. In making this argument, the petitioner contends that the Idaho Supreme Court has effectively required that all claims of ineffective assistance of counsel must be pursued in a post-conviction relief proceedings.[13] Petitioner suggests that the statute creates an insurmountable barrier to the assertion of such a claim because it is most unlikely that trial counsel would accurately point out his own errors, and it would be impossible to obtain other counsel within the short period of time prescribed by the statute.

The plaintiff's argument contains two fatal flaws. First, it ignores the language of the statute which requires a petition for post-conviction relief to contain "any legal or factual challenge as to the sentence or conviction *that is known or reasonably should be known.*" I.C. § 2719(3). This language has been interpreted by the Idaho Supreme Court as not precluding subsequent petitions to pursue claims which could not have been known at the time the first petition was filed. *Rhoades,* 120 Idaho at 807, 820 P.2d 665; *Palmer v. Dermitt,* 102 Idaho 591, 635 P.2d 955 (1981). The availability of subsequent petitions to pursue claims of ineffective assistance of counsel which could not have been known within 42 days, belies the petitioner's argument that I.C. § 19–2709 precludes him from pursuing a Sixth Amendment claim of ineffective assistance of counsel.

Second, the central premise of petitioner's argument, that the 42 day time limit precludes him from obtaining a new attorney to pursue claims that his trial counsel was ineffective, ignores the decision of the U.S. Supreme Court in *Murray v. Giarratano,* 492 U.S. 1, 109 S.Ct. 2765, 106 L.Ed.2d 1 (1989), and *Pennsylvania v. Finley,* 481 U.S. 551, 107 S.Ct. 1990, 95 L.Ed.2d 539 (1987), that there is no federal constitutional right to counsel for indigent

---

**13.** This conclusion results, not from judicial fiat, but from a recognition that post-conviction relief provides the only effective means for raising an ineffective assistance of counsel claim. This is so, because such a claim inherently depends upon the development of facts which do not appear in the trial record. Since a direct appeal is limited to the trial record, post-conviction relief proceedings is necessary to pursue an ineffective assistance claim. *Carter v. State,* 108 Idaho 788, 792, 702 P.2d 826 (1985).

death row inmates seeking post-conviction relief. In these decisions, the court ruled that neither the Due Process Clause of the Fourteenth Amendment nor the equal protection guarantee of "meaningful access" required the State to appoint counsel for indigent prisoners seeking state post-conviction relief. *Finley,* 481 U.S. at 556–57, 107 S.Ct. 1990. It seems axiomatic that if the petitioner had no constitutional right to counsel in his post-conviction relief proceedings, a state procedural statute which effectively prevented him from obtaining such counsel, would not violate his constitutional rights. For these reasons, the Court rejects petitioner's claim that I.C. § 19–2719 violates his Sixth Amendment rights.

In summary, this Court has found that the petitioner has failed to show that the application of I.C. § 19–2719 constitutes a violation of due process under the balancing test stated in *Mathews,* and summarized in *Foss.* While the petitioner has a right to adequate procedural safeguards, I.C. § 19–2719, provided him with the opportunity to present all issues which were properly before the court in a post-conviction proceeding. The petitioner has also failed to show that the shorter time limit for pursuing a post-conviction relief petition in a capital case violates his equal protection rights, since the shorter time period bears a rational relationship to a legitimate governmental interest. Finally, the petitioner has failed to establish that the 42 day time limit prevents him from raising ineffective assistance of counsel claims in a post-conviction relief petition.

### ORDER

Based on the foregoing, and the Court being otherwise fully advised in the premises; IT IS HEREBY ORDERED that:

1) The petitioner's Petition for Writ of Habeas Corpus (dkt.# 50) is DISMISSED.

2) The Stay of Execution is LIFTED.