161 F.3d 584
 29 Envtl. L. Rep. 20,330, 98 Cal. Daily Op.
Serv. 8660,
98 Daily Journal D.A.R. 12,037
 Richard D. FOSS, Plaintiff-Appellant,
v.
NATIONAL MARINE FISHERIES SERVICE; Steven Pennoyer, in his
capacity as Regional Director, National Marine Fisheries
Service; Michael Kantor, in his capacity as Secretary of
Commerce; Department of Commerce, Defendants-Appellees.
 No. 97-36097.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Sept. 15, 1998.
Decided Nov. 25, 1998.
 
 Wayne Mitchell, Harris & Hull, Seattle, Washington, for the plaintiff-appellant.
 M. Alice Thurston, Andrew C. Mergen, United States Department of Justice, Washington D.C. and Brian C. Kipnis, Office of the United States Attorney, Seattle, Washington, for the defendants-appellees.
 Appeal from the United States District Court for the Western District of Washington Thomas S. Zilly, District Judge, Presiding. D.C. No. CV-96-01583-TSZ.
 Before: SCHROEDER, WIGGINS and McKEOWN, Circuit Judges.
 McKEOWN, Circuit Judge:
 
 
 1
 This case calls upon us to decide whether an applicant for a federal fishing quota permit has a cognizable procedural due process claim. Appellant Richard Foss filed his application 45 days late and the National Marine Fisheries Service ("NMFS") denied the application as untimely. Foss claims that the denial violated his procedural due process rights and also challenges the denial on other grounds. The district court held that Foss had no property or liberty interest in the permit and hence did not have a due process claim, rejected his other claims, and granted summary judgment against him. We disagree with the district court's analysis of the due process issue. The fishing quota permit was a regulatory entitlement, not an abstract gleam in Foss's eye or a unilateral expectation. NMFS had no discretion to deny Foss's application, assuming he met the objective regulatory requirements. Under long-standing Ninth Circuit authority, we hold that for purposes of procedural due process, Foss had a protectible property interest in receiving a guaranteed fishing quota permit. Nonetheless, NMFS's procedures were "constitutionally sufficient" and NMFS properly denied Foss's application. Mathews v. Eldridge, 424 U.S. 319, 334, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). We affirm the district court's summary judgment in favor of NMFS.
 
 BACKGROUND
 
 2
 The Individual Fishing Quota ("IFQ") Program
 
 
 3
 Management of fishery resources presents difficult and competing choices. In an effort "to promote the conservation and management of halibut and sablefish resources," in 1993 the Secretary of Commerce adopted regulations to limit access to sablefish and halibut fisheries in the waters off of Alaska.[1] 57 Fed.Reg. 57,130 (1992); 58 Fed.Reg. 59,375 (1993); see also 50 C.F.R. Part 679.[2] This program, known as the Individual Fishing Quota ("IFQ") program, addressed problems, including overfishing, stemming from an historical regulatory regime that allowed unlimited entry to the fisheries. Limited-access programs, a dramatic change from the open-access approach, were discussed and analyzed for years prior to final implementation of the IFQ plan. The new program was an effort to conserve fishery resources while creating a stable market for transferable fishing rights. Before adopting the program, NMFS undertook extensive economic and environmental studies, reviewed alternative conservation options, published proposed rules and solicited public comment. See 57 Fed.Reg. 57,130-57,154 (1992); 58 Fed.Reg. 59,375-59,401 (1993). An excellent discussion of the program is found in Alliance Against IFQs v. Brown, 84 F.3d 343 (9th Cir.1996).
 
 
 4
 The IFQ program works as follows: NMFS initially divided the allowable catch of halibut and sablefish among holders of quota shares ("QS"). Eligibility for QS depended solely on the applicant's[3] total landings of halibut or sablefish during specified years. 50 C.F.R. § 679.40(a). An applicant who previously fished for (made "legal landings of") halibut or sablefish during qualifying years was automatically entitled to some amount of QS, calculated according to a regulatory formula. Id. The QS allocation then served as the basis for issuance of an IFQ permit. 50 C.F.R. § 679.40(b), (c). Allocation of initial QS was a one-time event. Subsequent IFQ permits are issued annually based on calculations stemming from the initial QS allocation. 50 C.F.R. § 679.40(b). Commercial fishing for halibut and sablefish in the regulated waters is limited to IFQ permit holders: no permit, no legal fishing. Id.; see also Alliance Against IFQs, 84 F.3d at 345. Because the IFQ permit and the QS on which the permit is based are functionally equivalent for purposes of this appeal, we refer to them collectively as "the IFQ permit."
 
 
 5
 The regulations are mandatory and NMFS has no discretion to reject applicants who meet the well-delineated statutory criteria for an IFQ permit. The only criteria for qualification are objective: The Regional Administrator of NMFS is required to grant an IFQ permit to any qualified person who made legal landings of halibut or sablefish during the qualifying years. See 50 C.F.R. § 679.40(a)(1) ("The Regional Administrator shall initially assign to qualified persons" an allocation of QS) (emphasis added); see also 50 C.F.R. § 679.40(b) ("The Regional Administrator shall assign halibut or sablefish IFQs to each person holding unrestricted QS for halibut or sablefish ....") (emphasis added); 50 C.F.R. § 679.40(a)(8) ("Uncontested data in applications will be approved by the Regional Administrator. Based on these data, the Regional Administrator will calculate each applicant's initial halibut and sablefish QS ....") (emphasis added); 50 C.F.R. § 679.40(c) ("The annual allocation of IFQ to any person ... will be equal to" a fixed calculation).
 
 
 6
 The final regulations required applications to be submitted to NMFS between January 17, 1994 and July 15, 1994. 59 Fed.Reg. 701, 702 (1994). NMFS went to great lengths to ensure that potential applicants were aware of this new and controversial program. In addition to formal notice in the Federal Register, NMFS sent applications to the thousands of fishermen in its database, sometimes (as in Foss's case) resending applications that were returned undelivered. NMFS also publicized the application period in industry magazines, news releases, paid advertisements, public service announcements and information workshops in Alaska and Washington.
 
 Appellant Foss
 
 7
 Foss, a long time commercial fisherman, had been aware since the early 1980s of the movement to establish a limited access program. In 1988, Foss quit fishing for halibut and sablefish off of Alaska, and shifted his focus to tuna fishing in the South Pacific. He returned to the United States for brief periods in the summer and fall of 1989 and the summer of 1990 and then returned to tuna fishing in Fiji and off of the South American coast. In December 1992, he contacted the International Pacific Halibut Commission ("IPHC")[4] to ask about the status of halibut regulation. The IPHC employee told him that an IFQ program had been proposed, but that nothing was imminent. In fact, NMFS published the proposed rules for the IFQ program on December 3, 1992. 57 Fed.Reg. at 57,130. The final rules were published on November 9, 1993, and the rule specifying the application period was published on January 6, 1994. 58 Fed.Reg. at 59,375; 59 Fed.Reg. at 701.
 
 
 8
 Foss claims he did not hear anything about the proposed program or the deadlines during this time frame because he was tuna fishing in the North and South Pacific. As part of its effort to provide individual notice to all potential applicants, NMFS sent two applications to Foss at the most recent address listed in its records, the residence where Foss previously lived with his then wife. Foss did not receive the applications, nor did he see the Federal Register regulations or the advertisements and announcements circulated by NMFS in various Washington and Alaska media. Although he was on land from April 1992 to November 1993 and between late April and late May 1994, Foss did not again contact the IPHC until August 2, 1994, approximately two weeks after the July 15, 1994 deadline. NMFS received Foss's application on August 30, 1994 (45 days after the deadline) and rejected it as untimely.ANALYSIS
 
 I. Procedural Due Process Claim
 
 9
 Foss argues that he was denied procedural due process because NMFS deprived him of entitlement to an IFQ permit without actual notice. We disagree. Foss's procedural due process claim hinges on proof of two elements: (1) a protectible liberty or property interest in obtaining the permit; and (2) a denial of adequate procedural protections. See Board of Regents v. Roth, 408 U.S. 564, 569-71, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); see also Mathews v. Eldridge, 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). Although Foss is correct that he has a protectible property interest in receiving the IFQ permit, his claim fails because he received all the process that was due him. Actual notice is not required.
 
 A. Property Interest
 
 10
 The threshold question is whether Foss has a constitutionally protectible property interest in acquiring an IFQ permit, i.e., "a legitimate claim of entitlement" as opposed to a "unilateral expectation" or an "abstract need or desire for it." Roth, 408 U.S. at 577, 92 S.Ct. 2701 (1972). There can be no doubt that the IFQ permit is property. It is subject to sale, transfer, lease, inheritance, and division as marital property in a dissolution. See 50 C.F.R. § 679.41; Johns v. Johns, 945 P.2d 1222, 1225-26 (Alaska 1997); Ferguson v. Ferguson, 928 P.2d 597, 599-600 (Alaska 1996). The property right in obtaining this specific permit is, of course, distinguishable from a claim of owning the fish themselves, which the Supreme Court has termed "pure fantasy." Douglas v. Seacoast Products, Inc., 431 U.S. 265, 284, 97 S.Ct. 1740, 52 L.Ed.2d 304 (1977).
 
 
 11
 The Ninth Circuit has long held that applicants have a property interest protectible under the Due Process Clause where the regulations establishing entitlement to the benefit are, as here, mandatory in nature. For example, in Griffeth v. Detrich, 603 F.2d 118 (9th Cir.1979), this court relied on Roth in holding that an applicant for welfare benefits had a "legitimate claim of entitlement" subject to due process protection in light of the "mandatory language" of the authorizing statute:
 
 
 12
 '[Property interests] are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.' ... Here the authorizing statute also uses mandatory language.... [The statute] coupled with the implementing regulations of the county creates a legitimate claim of entitlement and expectancy of benefits in persons who claim to meet the eligibility requirements.
 
 
 13
 Id. at 120-121 (quoting Roth, 408 U.S. at 577, 92 S.Ct. 2701). Similarly, in Wedges/Ledges of California, Inc. v. City of Phoenix, 24 F.3d 56 (9th Cir.1994), this court found that applicants for licenses to operate amusement games had protectible property interests because of significant statutory restrictions on the city's discretion to issue the licenses. The city code did "not provide any open-ended discretionary factors." Id. at 63. The same is true with the carefully circumscribed requirements in the NMFS regulations. See also Ressler v. Pierce, 692 F.2d 1212, 1215 (9th Cir.1982) (applicant for federal section 8 housing benefits has a property interest within meaning of the Due Process Clause because HUD has only "limited discretion in the ... application and selection process").
 
 
 14
 The district court erred in holding that Foss had no property interest in his IFQ permit, citing Parravano v. Babbitt, 861 F.Supp. 914 (N.D.Cal.1994), aff'd on other grounds, 70 F.3d 539 (9th Cir.1995), and two unpublished district court opinions. Parravano dealt with a claim of access to "federal ocean fisheries" under the general provisions of the Magnuson Act relating to fisheries conservation. Id. at 928. Unlike the specific, mandatory regulations implementing the IFQ program, the language of the Magnuson Act does not confer any claim of entitlement or property rights. We hold that, for procedural due process purposes, Foss has a protectible property interest in receiving the IFQ permit.
 
 B. NMFS Procedures
 
 15
 Having found that Foss has a property interest, we next turn to the Supreme Court's procedural due process balancing test set out in Mathews. To determine whether Foss received all the process that he was "due," the court must weigh (1) Foss's private property interest, (2) the risk of an erroneous deprivation of such interest through the procedures used, as well as the value of additional safeguards, and (3) the Government's interest in maintaining its procedures, including the burdens of additional procedural requirements. 424 U.S. at 334-35, 96 S.Ct. 893. This is not a bright-line test, but is flexible depending on the circumstances. Id. at 334, 96 S.Ct. 893. Flexibility requires no stretch here. Given the extensive notice and review procedures, we find NMFS's procedures "constitutionally sufficient." Id.
 
 
 16
 Foss has a substantial private property interest in receiving the IFQ permit. The parties do not dispute that Foss's IFQ permit would be worth approximately $850,000. Without the IFQ permit, Foss is foreclosed from halibut and sablefish fishing in the Alaska waters (absent purchase from another permit holder) and could not sell or transfer this valuable right.
 
 
 17
 Nevertheless, Foss's due process claim--a bare assertion that "actual notice should be required before the individual's right to issuance [of an IFQ permit] can be foreclosed"--fails upon analysis of the other two Mathews factors. The notification and appeal procedures were more than adequate and the risk of erroneous deprivation of the permit was virtually nil.
 
 
 18
 Undoubtedly recognizing that not everyone reads the Federal Register on a daily basis, NMFS went the extra mile to provide extensive notice. NMFS expressly considered (1) the difficulty of providing notice to thousands of potential applicants; (2) the need to expand notice beyond the Federal Register; (3) the fact that many potential applicants, like Foss, are away at sea for long periods of time; and (4) the need to tailor the notice and deadline requirements to the specific circumstances of the fishing industry. Before adopting the final regulations, NMFS also specifically responded to concerns about the application period and provision of notice:
 
 
 19
 Comment 51: The application for an initial allocation of QS should be announced in industry publications in addition to the Federal Register. Federal Register publications are the most cumbersome and confusing forms of communication on earth. In addition, a 180-day application period may not be long enough if it coincides with the primary fishing period of April through September.
 
 
 20
 Response: Although official notice of the QS application period will be given in the Federal Register, [the National Oceanic and Atmospheric Administration] will alert the fishing industry through more widely read publications and news announcements. In addition, NOAA will schedule the application period, at least in part, during fall or winter months when most of the fixed gear fishing fleet is not active.
 
 
 21
 58 Fed.Reg. at 59,392.
 
 
 22
 NMFS set the application period so that it would fall in part during months when the fleet was not active and undertook substantial efforts to provide the already-described notice alternatives to the Federal Register. The value of the "additional safeguard of actual notice" suggested by Foss is minimal. By Foss's own estimate, so far only five applicants (including Foss) have claimed that they did not receive actual notice. Foss also took advantage of the appeal process set out in 50 C.F.R. § 679.43. The appeals officer reviewed Foss's claim and his extensive submission in a careful and thoughtful decision. All of these facts demonstrate the low risk of an erroneous deprivation of an interest in obtaining an IFQ permit.
 
 
 23
 Finally, we examine the third Mathews factor, the government's interest. NMFS has a strong interest in maintaining its procedures and we should lean heavily on the agency's expertise in fashioning its application process. An application deadline serves the twin goals of fairness and predictability. The importance of a fixed application period cannot be underestimated. Readjusting the quota pool for untimely applications where applicants claimed to lack actual notice would frustrate the government's goal of establishing a fixed pool with a stable market value. In addition, requiring the government to provide actual notice to more than 7,500 applicants (applications were in fact sent to more than 12,000 potential applicants) would be an unwarranted burden. Although notice is a fundamental requirement of due process, see Tulsa Prof'l Collection Servs., Inc. v. Pope, 485 U.S. 478, 484, 108 S.Ct. 1340, 99 L.Ed.2d 565 (1988) (citing Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed. 865 (1950)), NMFS's notice procedures here are "more than ample to satisfy any due process concerns." Lyng v. Payne, 476 U.S. 926, 942-43, 106 S.Ct. 2333, 90 L.Ed.2d 921 (1986) (notice of deadline in the Federal Register as well as in local news media comported with due process) (citing 44 U.S.C. § 1507).
 
 
 24
 Accordingly, Foss received all the notice and process that was due. He appears to look at the Mathews inquiry as an endgame--essentially arguing that because he was ultimately denied a permit, the procedures are inherently inadequate--rather than as a review of the entire complement of procedural protections. "The essence of due process is the requirement that a person in jeopardy of serious loss (be given) notice of the case against him and an opportunity to meet it.... All that is necessary is that the procedures be tailored ... to insure that [claimants] are given a meaningful opportunity to present their case." Mathews, 424 U.S. at 348-49 (citations omitted). NMFS's procedures afforded Foss exactly that opportunity.
 
 II. Arbitrary and Capricious Claim
 
 25
 We reject Foss's claim that only an actual notice rule would suffice and that the regulation adopting a fixed deadline, without regard to actual notice, is arbitrary and capricious. This court's review of the notice rule is narrow:
 
 
 26
 [O]ur only function is to determine whether the Secretary 'has considered the relevant factors and articulated a rational connection between the facts found and the choice made.' ... We cannot substitute our judgment of what might be a better regulatory scheme, or overturn a regulation because we disagree with it....
 
 
 27
 Alliance Against IFQs, 84 F.3d at 345 (quoting Washington Crab Producers, Inc. v. Mosbacher, 924 F.2d 1438, 1440 (9th Cir.1990)). The rule establishing a 180-day application period without requiring NMFS to provide actual notice to all of the thousands of potential applicants is a rational one for the reasons discussed above.[5]
 
 III. Equitable Tolling Claim
 
 28
 The district court properly rejected Foss's equitable tolling claim. Foss argues that the deadline should be equitably tolled because he was misled by an IPHC representative who told him in December 1992 that an IFQ program had been proposed but nothing was "imminent." Equitable tolling applies against the government "only sparingly," and does not extend to Foss's situation which "is at best a garden variety claim of excusable neglect." Irwin v. Department of Veterans Affairs, 498 U.S. 89, 96, 111 S.Ct. 453, 112 L.Ed.2d 435 (1990). The doctrine is applied in "two generally distinct kinds of situations," neither of which applies here. Seattle Audubon Soc'y v. Robertson, 931 F.2d 590, 595 (9th Cir.1991) (citing Forti v. Suarez-Mason, 672 F.Supp. 1531, 1549-50 (N.D.Cal.1987), reconsideration granted in part on other grounds, 694 F.Supp. 707 (N.D.Cal.1988)). First, Foss cannot establish that the IPHC representative's statement was "wrongful conduct" within the meaning of this doctrine. See Forti, 672 F.Supp. at 1549 (equitable tolling proper where defendant fraudulently conceals facts or flees to avoid liability). Nor can Foss credibly argue that his choice to live in the South Pacific without informing NMFS of his new address was an "extraordinary circumstance" beyond his control that prevented a timely filing. Seattle Audubon, 931 F.2d at 595. We are not unsympathetic to Foss's situation; we simply cannot grant relief for circumstances of his own making.
 
 
 29
 IV. Administrative Procedures Act ("APA") Claim
 
 
 30
 Foss's final argument--that the rule establishing a July 15, 1994 deadline violated the Administrative Procedures Act ("APA"), specifically 5 U.S.C. § 553, because it was promulgated without notice or comment--finds no support in the record. Advance notice of the rule could hardly be clearer. The proposed rules published in the Federal Register provided that a "QS application period of no less than 180 days would be announced" and that "[c]ompleted QS applications received by the Regional Director before the end of the application period would be acknowledged." 57 Fed.Reg. at 57,135. The rule announcing the July 15, 1994 deadline, 59 Fed.Reg. at 702, complied with the APA because it was "in character" with the original proposed rules and a "logical outgrowth" of the comments regarding the timing of the application period. See Rybachek v. United States Envtl. Protection Agency, 904 F.2d 1276, 1288 (9th Cir.1990). Public comment was extensive, as reflected in the more than seventeen pages of Response to Comments, including specific references to the notice issue. 58 Fed.Reg. at 59,383-400. Foss has no legitimate complaint about the procedures leading up to adoption of the deadline rule.
 
 
 31
 AFFIRMED.
 
 
 
 [1]
 Authority to regulate these fisheries is found in the Magnuson Fishery Conservation and Management Act ("Magnuson Act"), 16 U.S.C. §§ 1801-1883, and the Northern Pacific Halibut Act of 1982 ("Halibut Act"), 16 U.S.C. §§ 773-773k
 
 
 [2]
 50 C.F.R. Part 679 is a recodification of former Parts 671, 672, 673, 675, 676 and 677, which were adopted unchanged as far as relevant to this appeal. 61 Fed.Reg. 31,230 (1996)
 
 
 [3]
 The applicant was required to be a "qualified person," which was defined according to vessel lease or ownership. 50 C.F.R. § 679.40(a)(2)
 
 
 [4]
 The IPHC is an international body which has "primary authority for managing" the domestic halibut fishery in and off of Alaska. The Halibut Act authorizes NMFS to develop regulations that are "in addition to, but not in conflict with" regulations adopted by the IPHC. 16 U.S.C. § 773(a), (b); 57 Fed.Reg. at 57,131
 
 
 [5]
 Similarly, it was not arbitrary and capricious for NMFS to decline Foss's "alternative" of not enforcing the deadline against those who lacked actual notice. See Alliance Against IFQs, 84 F.3d at 352 (IFQ regulations held not arbitrary and capricious because of rational basis for rule adopted, despite recognition that "[a]lternative schemes can easily be imagined," and "some parties' interests are injured")