The **FISHING COMPANY OF ALASKA, et al.,** Plaintiffs,

v.

**THE UNITED STATES of America, et al., Defendants.**

No. C97–126Z.

United States District Court, W.D. Washington at Seattle.

March 5, 2002.

John R. Neeleman, Lane Powell Spears Lubersky, Seattle, for Fishing Company of Alaska, Inc., a Washington corporation, William McGill, Richard Joseph, plaintiffs.

Samuel D. Rauch, III, Richard A. Monikowski, U.S. Department of Justice, Enrd, Wildlife & Marine Resources, Washington, DC, Warigia M. Bowman, Mary M. Whittle, U.S. Department of Justice, Environmental & Natural, Resources, Washington, DC, for United States of America, Department of Commerce, Stuart E. Eizenstat, Ambassador, Acting Secretary of Commerce in his official capacity, defendants.

## ORDER

ZILLY, District Judge.

This action involves judicial review of regulations promulgated and civil penalties assessed by the National Oceanic and Atmospheric Administration ("NOAA" or "Agency"). This matter comes before the Court on the following motions: Plaintiffs' motion for summary judgment, docket no. 44; defendants' motion for summary judgment, docket no. 50; plaintiffs' motion to strike, docket no. 57; and plaintiffs' motion for leave to offer extra-record evidence, docket no. 59. The parties have agreed that this matter may be decided on these motions and without trial. While the parties have requested oral argument, the Court finds that these motions fully develop the issues presented and no oral argument is necessary. The Court hereby GRANTS plaintiffs' motion to strike and DENIES plaintiffs' motion for leave to offer extra-record evidence. The Court hereby GRANTS defendants' motion for summary judgment on all claims and hereby dismisses this action.

## I. BACKGROUND

This action arises out of plaintiffs' incidental catches of halibut while fishing for groundfish off Alaska in 1991. Plaintiff Fishing Company of Alaska ("FCA") is a commercial fishing company that operates

trawler fishing vessels, including the ALASKA RANGER and the ALASKA I. Plaintiffs William McGill and Richard Joseph were captains of the ALASKA RANGER during the time at issue here. The captain of the ALASKA I has since died.

Plaintiffs were fined for violating regulations governing the Bering Sea/Aleutian Island ("BSAI") groundfish fishery. These regulations implement a Vessel Incentive Program ("VIP") created by the North Pacific Fishery Management Council ("Council") as part of its responsibility under the Magnuson–Stevens Fishery Conservation and Management Act, 16 U.S.C. §§ 1801–1883,[1] for developing fishery management plans ("FMPs") for the North Pacific fisheries. 16 U.S.C. § 1852. The North Pacific Fisheries Management Council, like all such Councils, is composed of industry and government representatives. 16 U.S.C. § 1852(b). The Secretary of Commerce has ultimate responsibility for reviewing an FMP and approving regulations to implement the plans, as the Secretary did here.[2] 16 U.S.C. § 1854. The regulations at issue here target the amount of halibut and crab that may be incidentally caught as "bycatch" while fishing for groundfish species such as pollock, Pacific cod, and yellowfin sole.

The regulations under which the plaintiffs were fined were chosen after alternatives had been rejected. The Secretary first approved bycatch limits in 1989. Final Rule Implementing Amendment 12a to BSAI FMP, 54 Fed.Reg. 32642 (Aug. 9, 1989). This first system set a fishery-wide bycatch limit under which the entire fishery would close once the limit was reached. This approach was rejected as prompting a race to maximize catches, regardless of bycatch, before the fishery was closed. VIP AR[3] 192, 242, 368, 862. Seeking to provide incentives to each vessel, the Council then proposed what it called a "penalty box" program. This proposal would use current, in-season data taken from the fisheries in which the vessel was operating in order to set bycatch rates. VIP AR 3969. Each vessel's performance would then be measured against this data. VIP AR 2104. Vessels exceeding the current rates would be required to stop fishing. Final Rule Implementing Amendment 16 to BSAI FMP, 56 Fed.Reg. 2700, 2701 (Jan 24, 1991). The National Marine Fisheries Service ("NMFS") rejected this plan as imposing high costs without any corresponding benefit. *Id.*

The current regulations fix quarterly bycatch rates based on historical bycatch data. The vessel bycatch rate is a ratio of kilograms of halibut to metric tons of groundfish (kg/mt). 50 C.F.R. § 675.26(d)(3)(i)(C).[4] Onboard observers sample each vessel's hauls, communicate

---

1. The Sustainable Fisheries Act of 1996 changed the Magnuson Act to the Magnuson–Stevens Act. Pub.L. 104–297, 110 Stat. 3559 (1996).

2. The chain of command under the Magnuson–Stevens Act runs as follows: the Act creates eight regional fisheries management councils (the North Pacific Fisheries Management Council has jurisdiction over fisheries in the Arctic Ocean, Bering Sea, and Pacific Ocean seaward of Alaska). These councils propose fisheries management plans. The National Marine Fisheries Service (NMFS) reviews these plans. NMFS is a subagency of

the National Oceanic and Atmospheric Administration ("NOAA" or "Agency"). NOAA is an Agency in the Department of Commerce.

3. The administrative record in this matter is comprised of two parts: (1) that portion covering adoption of the VIP (the "VIP AR"); and (2) that portion covering the enforcement action against plaintiffs, which is organized in volumes and thus identified as "AR Vol. [x]".

4. In 1996, these regulations were moved to 50 C.F.R. § 679.21. However, the parties have used the numbering as it existed when the plaintiffs were charged. For sake of clarity,

bycatch and groundfish data to NMFS on a weekly basis, and make such data available to the vessel operator. 50 C.F.R. § 675.26(d)(2). NMFS then confirms the observers' data and calculates a vessel's bycatch rate at the end of a fishing month in which the observer sampled at least fifty percent of the vessel's hauls. 50 C.F.R. § 675.26(d)(3)(i)(B). The vessel's rate cannot exceed the quarterly bycatch rate during any fishing month. 50 C.F.R. § 675.7(g). The relevant rate here was 5kg/mt for the third quarter in 1991, covering July and August, the months for which plaintiffs were fined.[5]

Plaintiffs do not dispute that they exceeded the bycatch rate for July and August. The ALASKA I had halibut bycatch rates of 16.2 and 16.8 kg/mt for July and August, respectively. AR Vol. XIV, Tab 47. The ALASKA RANGER had halibut bycatch rates of 35.8 and 11.2 kg/mt for July and August, respectively. AR Vol. IX, Tab 26. On April 17, 1996, the Administrative Law Judge (ALJ) assessed $75,000 for each monthly violation per vessel, and then suspended a total of $50,000 per vessel on the condition that the plaintiffs not violate the Act for two years. Initial Decisions, AR Vol. III, Tab 95, at 26 (ALASKA RANGER); 26 (ALASKA I). The resulting penalty was $100,000 per vessel. The ALJ held the vessel owners and captains jointly and severally liable. The Secretary of Commerce, through the Deputy Under Secretary for Oceans and Atmosphere, denied plaintiffs' petition for review. This action for judicial review followed.

## II. THRESHOLD MOTIONS

Two threshold motions determine the scope of the record before the Court.

the Court refers to the regulations as numbered by the parties.

Plaintiffs have filed a motion to strike two extra-record affidavits submitted by the Agency, docket no. 57, and a motion for leave to offer extra-record evidence, docket no. 59. The Court GRANTS the motion to strike, and DENIES the motion for leave to offer extra-record evidence.

### A. Motion to Strike

 Plaintiffs seek to strike two affidavits filed by the defendants as being outside of the administrative record. Generally, judicial review of an agency decision is limited to the administrative record. *First Nat. Bank & Trust, Wibaux, Mont. v. Dep't of Treasury*, 63 F.3d 894, 897 (9th Cir.1995). However, there are exceptions to this rule. The court may consider extrinsic evidence when: (1) the record so fails to explain agency action that judicial review is frustrated; (2) it appears that the agency has relied on documents or materials not included in the record; or (3) where supplementation is necessary to explain complex terms or technical matters. *Public Power Council v. Johnson*, 674 F.2d 791, 793–95 (9th Cir.1982); *City and County of San Francisco v. United States*, 930 F.Supp. 1348, 1355–56 (N.D.Cal.1996).

The Agency filed the two disputed affidavits with its combined response to plaintiffs' motion for summary judgment and cross-motion for summary judgment. The declaration of Susan Auer, docket no. 52, discusses other enforcement actions brought contemporaneously with the action against the plaintiffs. The Agency filed this affidavit to rebut plaintiffs' claims of selective prosecution. The Agency filed the affidavit of Susan Salveson stating that the North Pacific Fisheries Council had not adopted any system of fines as permit-

**5.** The bycatch rate for the third quarter of 1991 had been 3kg/mt but was retroactively increased to 5kg/mt on August 14, 1991. 56 Fed.Reg. 41309 (Aug. 20, 1991).

ted by the 1996 amendments. The Agency filed this affidavit in response to the plaintiffs claims that the Amendments should be retroactively applied. The Agency claims both affidavits are in response to collateral attacks outside of the administrative record. Defendants' Reply, docket no. 63, at 2.

Both affidavits are irrelevant. Whether there were other actions against other parties was not before the ALJ, is ultimately irrelevant to plaintiffs' selective prosecution claim, and need not be considered by this Court. Furthermore, whether or not the fisheries council has exercised a specific authority does not influence this Court's construction of that authority. These supplements to the record are unnecessary and are therefore STRICKEN.

**B. Motion for Leave to Offer**

■ Plaintiffs also have moved to supplement the administrative record with transcripts of recent testimony and seek leave to obtain additional depositions. Alternatively, plaintiffs seek a remand to the ALJ to develop this evidence. Plaintiffs rely on a final exception to the "record rule" recognized by the *Johnson* court, which permits supplementation of the administrative record where agency bad faith is alleged. *Johnson,* 674 F.2d at 795. However, there must be a "strong showing of bad faith or improper behavior before the court may inquire into the thought processes of administrative decision makers." *Id.*

Plaintiffs seek to introduce testimony given on October 8, 2001, by Agency and Council personnel that the VIP is not working as designed. Plaintiffs' Memo, docket no. 66, at 3. Plaintiffs argue that this testimony is evidence that the Agency's enforcement action was undertaken in bad faith because it is not based on the best scientific evidence. *Id.* Defendants counter that not only have plaintiffs failed

to present any evidence of bad faith, the testimony proffered does not indicate bad faith. Defendants' Response, docket no. 63, at 2.

This testimony does not prove any bad faith. Instead, it merely suggests that the VIP is not achieving the reduced bycatch that it was intended to achieve. Such a failure may be the result of many factors, including the refusal of violators to meet the targets or pay their fines when they exceed the targets. This is the first time plaintiffs have even suggested bad faith by the Agency. Admissions ten years later that a program is not having the intended results cannot retroactively transform the implementation and enforcement of the program into bad faith; a mistake is not malice. Accordingly, plaintiffs' request to supplement the record is DENIED.

**III. SUMMARY JUDGMENT MOTIONS**

■ Plaintiffs' motion for summary judgment challenges the VIP regulations and the penalties assessed against plaintiffs for violations of these regulations. Defendants' cross-motion asks this Court to affirm these penalties. Generally, regulations promulgated by the Secretary under the Magnuson–Stevens Act are subject to judicial review if a petition for review is filed within thirty days of promulgation. 16 U.S.C. § 1855(f)(1); *Norbird Fisheries, Inc. v. National Marine Fisheries Serv.,* 112 F.3d 414, 416 (9th Cir.1997). However, § 1861(d) confers jurisdiction to hear collateral attacks on regulations in enforcement actions brought outside this thirty-day period. *Jensen v. United States,* 743 F.Supp. 1091, 1105 (D.N.J.1990); *Gulf of Maine Trawlers v. United States,* 674 F.Supp. 927, 933 (D.Me.1987); *United States v. Seafoam II,* 528 F.Supp. 1133, 1138–39 (D.Alaska 1982); *see also, Kramer v. Mosbacher,* 878 F.2d 134, 136 (4th Cir.

1989). Furthermore, the Act permits judicial review of a civil penalty within thirty days of the Secretary's order assessing such penalties. 16 U.S.C. § 1858(b). Here, the Secretary mailed the denial of discretionary review to the parties on December 27, 1996 and the plaintiffs filed their complaint on January 27, 1997. Therefore, this Court has jurisdiction to review both the regulations and the penalties under the Administrative Procedures Act ("APA"). 16 U.S.C. §§ 1858(b), 1861(d).

■ The APA directs this Court to set aside the Agency's actions and regulations where such actions or regulations are "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; ... [or] (D) without observance of procedure required by law." 5 U.S.C. § 706(2). Because this matter comes before the Court on cross-motions for summary judgment, the Court's function "is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision that it did." *City & County of San Francisco v. United States,* 130 F.3d 873, 877 (9th Cir.1997).

Plaintiffs raise several challenges to the regulations and resulting penalties in this action for review. These several species of challenge group into three genera: (1) collateral attacks on the facial validity of the regulations; (2) as applied challenges to the constitutionality of the prosecution against the plaintiffs; and (3) challenges to the actual penalties imposed. All the challenges attack choices made by the Agency regarding the best means to implement the overall policy of reducing bycatch. Because these choices are committed to the expert discretion of the Agency, plaintiffs cannot point to errors sufficient to justify judicial relief.

### A. Collateral Attacks on the Facial Validity of the VIP Regulations

Plaintiffs mount three collateral attacks on the facial validity of the regulations: (1) the VIP is arbitrary and capricious because it was not based on the best scientific evidence available; (2) the VIP violates due process; and (3) the VIP violates the procedural requirements of the APA because it failed to include a concise general statement of the law. All three of these attacks turn on two alleged deficiencies of the VIP. First, plaintiffs claim that the Agency failed to take into account monthly variations in halibut concentrations when setting the VIP regulations. Second, plaintiffs claim that the Agency failed to indicate how vessels could comply with the VIP regulations.

### 1. Arbitrary and Capricious Challenges

■ Plaintiffs claim that the VIP regulations were arbitrary and capricious because they failed to take into account the monthly variations in halibut concentrations and because they failed to inform the vessels how to reduce their bycatch. A court reviewing agency actions under the arbitrary and capricious standard looks to see whether the agency considered relevant factors and whether there has been clear error. *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989). Review is narrow and the Court may not simply substitute its judgment for that of the agency. *Washington v. Daley,* 173 F.3d 1158, 1169 (9th Cir.1999). However, the Agency must have articulated a rational connection between the facts found and the choice made. *Id.*

Plaintiff's argument here turns on the Magnuson–Stevens Act's requirements that any FMP and regulations implementing the plan must be consistent with spe-

cifically enumerated national standards at 16 U.S.C. § 1851(a). The second national standard requires that regulations "shall be based on the best scientific information available," while the sixth national standard requires regulations to "take into account and allow for variations among, and contingencies in, fisheries, fishery resources, and catches." 16 U.S.C. §§ 1851(a)(2), (6). Plaintiffs argue that the bycatch-rate standard violated these national standards because the fleet-wide halibut bycatch rate is much higher in the summer months than the rest of the year, and because the Agency did not consider whether it was even possible for the vessels to comply with the standards. Plaintiffs' Memo, docket no. 45, at 22–24.

■ An agency retains discretion in how best to comply with the national standards. National standard 2 does not compel specific analytical methods, *Washington Crab Producers, Inc. v. Mosbacher*, 924 F.2d 1438, 1444 (9th Cir.1990), nor does it require the agency to collect all possible data before acting. *Parravano v. Babbitt*, 837 F.Supp. 1034, 1041 (N.D.Cal. 1993). Even the unavailability of dispositive evidence may not render an agency's decision arbitrary and capricious. *See Greenpeace Action v. Franklin*, 14 F.3d 1324, 1336 (9th Cir.1992). However, national standard 2 dictates that the Secretary cannot simply create a rule out of whole cloth or one based on mere political compromise: a regulation must be based on concrete analysis that permits the Secretary to "rationally conclude that his approach would accomplish his legitimate objectives." *Parravano*, 837 F.Supp. at 1047 (invalidating emergency regulations that were based on conclusory analysis); *see also Massachusetts ex rel. Div. of Marine Fisheries v. Daley*, 170 F.3d 23, 30 (1st Cir.1999) (finding violation of national standard 2 where Agency gave no explicit explanation for its purpose in adopting specific quotas). National standard 6 "dic-

tates flexibility on the part of fishery managers.... [and] requires only that the Secretary's management measures be flexible enough to take into account sudden changed circumstances." *J.H. Miles & Co., Inc. v. Brown*, 910 F.Supp. 1138, 1155 (E.D.Va.1995).

**a. Consideration of monthly variations**

■ The record demonstrates that the process by which the Agency set the bycatch rate was based on the best data available. From the outset of this process, the Agency was concerned with which data to use. *E.g.*, VIP AR 383; VIP AR 1752, 1754. The Council initially proposed using current, in-season data taken from the fisheries in which the measured vessel was operating. VIP AR 3950, 3969. NMFS rejected this data as imprecise, impractical to collect, and ineffective in reducing bycatch. VIP AR 2887–88; 3232–34. Ultimately, NMFS determined that using historical data from the 1990 season and from the historical joint domestic/foreign fisheries, data collected from 1981 to 1990, would provide the most accurate data upon which to base its standards for 1991. *Id.* Thus, under the regulations NMFS gathered weekly data from 1990 for each vessel for which data was available. *See* VIP AR 3373–74. If data from 1990 was not available, NMFS turned to historical data from the joint domestic/foreign fisheries. Proposed Rule Implementing Revised Amendment 16 to BSAI FMP, 56 Fed.Reg. 1612, 1615 (Jan. 16, 1991).

Plaintiffs first argue that the Agency used the wrong data. Plaintiffs initially attack the use of data from the early 1980's during the joint domestic/foreign fisheries venture. Plaintiffs' Memo, docket no. 45, at 22. This attack argues that use of historical data resulted in a too-low standard by watering down the high rates

of bycatch observed in the late 1980's. *Id.* However, the record indicates that the standards were mostly taken from 1990 data. Proposed Rule re: Revised Amendment 16, 56 Fed.Reg. at 1615.

Plaintiffs point to the testimony of Michael Flanagan, the Agency's Supervisory Special Agent for the North Pacific fishery, and Steve Davis, a former staff biologist and Deputy Director of the North Pacific Fisheries Management Council, to suggest that the Agency arbitrarily relied too heavily on historical data. Mr. Davis testified that he understood that the Council relied "very heavily" upon a "Wheelhouse Manual" collecting the previous ten years worth of data, Neeleman Declaration, docket no. 46, Exhibit D at 274, and Mr. Flanagan testified that he believed that the 3 kg/mt rate was "primarily based on historical joint venture rates." Neeleman Declaration, docket no. 46, Exhibit E at 226. Plaintiffs' evidence raises a question of fact about the extent to which the Agency used historical data. However, the Agency articulated a clear need to develop an adequate sample from which bycatch rates could be calculated. Even assuming use of data from the early 1980's, the Agency's decision was reasonable because the historical data in its aggregate form was the best data available where quarterly catch rates from 1990 were not available.

From the data that it did use, NMFS calculated a quarterly average bycatch rate. VIP AR 3374. Plaintiffs attack this calculation, arguing that a calculation based on a monthly average would have better accounted for monthly fluctuations in halibut concentrations. Plaintiffs' Memo, docket no. 45, at 22. However, the record demonstrates that the Agency was concerned from the start about allowing for seasonal variations. Early on the Agency noted that "the determination of bycatch rates is not independent of the distribution of bycatch species ... [and] the relationship between bycatch rates, biomass of bycatch species, and harvest of the target fisheries is poorly understood." VIP AR 383. Moreover, a seasonal bycatch rate was chosen "to allow for seasonality in the factors that affect bycatch rates." VIP AR 3373; *see also,* Interim Final Rule Implementing Revised Amendment 16 to BSAI FMP, 56 Fed.Reg. 21619, 21622 (May 10, 1991); Proposed Rule re: Revised Amendment 16, 56 Fed.Reg. at 1614. The Regional Director had the power to make in-season adjustments to the bycatch standards based on several factors, including the immediately preceding season's bycatch rates. Interim Final Rule re: Revised Amendment 16, 56 Fed. Reg. at 21622; Proposed Rule re: Revised Amendment 16, 56 Fed.Reg. at 1614. The seasonal standard therefore accounts for seasonal variations in past bycatch rates, while the standards were susceptible to frequent adjustment to reflect such fluctuation. Indeed, the standard was adjusted upward in the middle of the third quarter 1991 from 3 kg/mt to 5kg/mt, based on public comment noting a high bycatch rate in July 1991. 56 Fed Reg. 41309 (August 20, 1991). In short, the calculation chosen by the Agency was expressly intended to serve the very purpose for which plaintiffs now argue.

Plaintiffs also argue that because the VIP based violations on a vessel's performance during a fishing month, the standard should also have been based on a fishing month rather than a quarterly rate. Plaintiff's Response, docket no. 58, at 12. The Agency's stated purpose throughout the development of these regulations was to develop effective incentives to reduce bycatch, incentives that would target specific violators without punishing the entire fleet. *E.g.,* Interim Final Rule re: Revised Amendment 16, 56 Fed.Reg. at 21621; Proposed Rule re:

Revised Amendment 16, 56 Fed.Reg. at 1613. The Agency clearly stated that it intended to use the full discretion of the Magnuson–Stevens Act's civil penalties provisions as part of those incentives, *see* Interim Final Rule re: Revised Amendment 16, 56 Fed.Reg. at 21621; Proposed Rule re: Revised Amendment 16, 56 Fed. Reg. at 1613. These penalty provisions permit penalties "for each day of a continuing violation." 16 U.S.C. § 1858(a). The Proposed Rule indicated that using monthly enforcement periods would provide greater incentive than a single quarterly enforcement period. Proposed Rule re: Revised Amendment 16, 56 Fed.Reg. at 1615. The Agency therefore articulated a rational connection between the desired incentives and its discretionary decision to enforce the regulations on a monthly basis.

■ Finally, plaintiffs argue that the bycatch standard in general is arbitrary and capricious because it has the unintended consequence of encouraging vessels to fish more in order to water down an initially high bycatch rate. Plaintiffs' Response, docket no. 58, at 17–18. This argument would prefer the use of current, in-fishery data as opposed to historical data. However, current average rates are precisely what the Council initially proposed in its "penalty box" proposal. VIP AR 3969. NMFS explicitly rejected the use of current data in favor of historical data when it rejected this program. Final Rule re: Amendment 16, 56 Fed.Reg. at 2701. Specifically, NMFS expressed concern that such data would come at too high a cost without a corresponding benefit, *id.*, and would be too difficult to calculate and "may not truly reflect the intrinsic bycatch rates of target operations." VIP AR 2888. The Agency's explicit decision to avoid the insurmountable transaction costs of such a program can hardly be called arbitrary and capricious.

**b. Consideration of ability to comply**

■ Plaintiffs also attack the regulations as arbitrary and capricious for not considering whether it was feasible for vessels to meet the bycatch standards, and for not providing suggestions how the vessels could so comply. Plaintiffs' Memo, docket no. 45, at 23. Plaintiffs also challenge the Agency's mere "recitation of anecdotal information" regarding suggestions for compliance. Plaintiff's Response, docket no. 58, at 17. Neither alleged shortcoming satisfies the arbitrary and capricious standard.

A major component of the process by which the Agency arrived at the 1991 standards was a consideration of the fleet's voluntary efforts in 1990 to reduce bycatch. By examining actual bycatch data from the third quarter of 1990, NMFS determined that "by voluntarily undertaking reduction measures, the bulk of the fishery (85%) was able to fish at a low bycatch rate of 0.08 kg/mt." VIP AR 3375–76. In other words, the very statistical model by which the Agency set the third-quarter 1991 bycatch standard was based on the observed viability of voluntary reductions. Even then, however, the Agency adopted, at the behest of the Council's Advisory Panel, a 3 kg/mt standard based on the fleet-wide data (as opposed to data from the "cleanest" vessels) for the third-quarter 1990. VIP AR 3929. The Council concluded that use of fleet-wide data would allow for compliance by the vast majority of vessels, while still providing incentives to avoid high bycatch rates. Proposed Rule re: Revised Amendment 16, 56 Fed.Reg. at 1615. Because the Council and its Advisory Panel included several industry representatives, these changes indicate that the industry itself believed compliance to be possible. Finally, in one last concession to the actual ability to comply with the standard, the

Agency retroactively raised the standard from 3 kg/mt to 5 kg/mt in the middle of the third quarter based on public comment from observations of high bycatch in July 1991. 56 Fed.Reg. 41309. Throughout the process, the bycatch standard was reasonably calibrated to a level at which a majority of the fleet could perform, while providing strong incentives to avoid high bycatch rates.

■ Plaintiffs also allege that the Agency nowhere considered "the economic consequences of the VIP on the regulated entities." Plaintiffs' Response, docket no. 58, at 16. The national standards require the Agency to engage in a cost-benefit analysis of the proposed regulations. *See Associated Fisheries of Maine, Inc. v. Daley,* 127 F.3d 104, 110 (1st Cir.1997) (noting that "to ensure compliance with these standards, the responsible agency must perform a cost/benefit analysis ancillary to the promulgation of an FMP"). The Agency satisfied this requirement with an explanation of the high costs and minimal benefits of the penalty box program, Final Rule re: Revised Amendment 16, 56 Fed. Reg. at 2701, as well as the commentary accompanying the proposed regulations, which discusses the costs and benefits of bycatch regulation. Proposed Rule re: Amendment 16, 56 Fed.Reg. at 1613.

### c. Conclusion

The record demonstrates that the VIP was created in compliance with the Act's national standards. The Agency explicitly considered the seasonal variations in bycatch rates, the results of the voluntary compliance during the 1990 fishing season, and the costs and benefits of the various plans. The Court finds: (1) the Agency's analysis of available data supported the rational conclusion that the VIP regulations would achieve bycatch reduction, in compliance with national standard 2; (2) the VIP included a process for responding

to sudden changes, in compliance with national standard 6; and (3) the Agency conducted a cost-benefit analysis consistent with the overall requirements of the national standards. Therefore, the Agency's actions were not arbitrary and capricious.

### 2. Constitutional Challenges to the Regulations

■ Plaintiffs' constitutional attack on the regulations relies upon the notice requirements of due process. Plaintiffs argue that the regulations did not provide sufficient guidance on what a vessel must do to avoid bycatch. Plaintiffs' Memo, docket no. 45, at 24–28. This argument, however, merely attempts to turn plaintiffs' noncompliance with the regulations into faults in the regulations of a constitutional magnitude.

■ Due process requires notice before deprivation of a property right. *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed. 865 (1950). In evaluating the procedure actually used, the court weighs (1) the private property interest, (2) the risk of erroneous deprivation of such interest through the procedures used, and (3) the government's interest in maintaining its procedures, including the burdens of additional requirements. *Mathews v. Eldridge,* 424 U.S. 319, 334–35, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976); *Foss v. National Marine Fisheries Service,* 161 F.3d 584, 589 (9th Cir.1998). In the regulatory context, a regulated entity must have fair notice of what an agency's interpretation expects of it. *General Elec. Co. v. U.S. E.P.A.,* 53 F.3d 1324, 1328 (D.C.Cir.1995). Notice is fair when the agency's interpretation is within a reasonable person's understanding of the regulations. *Id.* at 1330.

There is absolutely no question what was required of the plaintiffs here: Do not

exceed a monthly average of 5 kilograms of halibut bycatch per metric ton of target fish caught, or risk a monetary penalty. This requirement was adopted by the industry itself, was stated clearly in the Federal Register, and the plaintiffs admit that they had actual notice of the regulation because they took actual steps to attempt to comply. *See* Plaintiffs' Memo, docket no. 45, at 14. None of the cases cited by plaintiffs stands for anything other than the proposition that there may be a due process violation where a regulated entity does not have notice of an agency's interpretation of a regulation. *See United States v. Chrysler Corp.*, 158 F.3d 1350, 1356 (D.C.Cir.1998) (finding inadequate notice of agency's interpretation of proper testing technique for auto safety belts); *General Electric*, 53 F.3d at 1331 (finding no notice in regulations of agency's interpretation that would prohibit pre-disposal processing of PCBs); *Gates & Fox Co. v. Occupational Safety and Health Review Comm'n*, 790 F.2d 154, 156 (D.C.Cir.1986) (finding ambiguity in regulations that failed to give adequate notice). These cases are inapposite as there was no ambiguity in the regulation here and the Agency's interpretation of those regulations in no way differed from the regulations: both clearly stated that exceeding 5 kg/mt in the third quarter of 1991 was a violation punishable by up to $100,000.

■ Plaintiffs attempt to read an ambiguity into the regulations by claiming they had a right to know of means by which they could comply, or that they had a right to know that they were required to stop fishing if they exceeded the bycatch rate for the month. Under the *Mathews v. Eldridge* balancing test, these arguments hold no water. Plaintiffs undoubtedly had a property interest in continuing to fish. *See Foss*, 161 F.3d at 588. The additional safeguards plaintiffs would have liked would do nothing to guard against the risk of *erroneous* deprivation: error

would be a function of observer sampling or monthly calculation by NMFS, not a function of suggestions of how to avoid being penalized. Finally, the government has a strong interest in setting standards that will achieve its regulatory goals. *See Foss*, 161 F.3d at 589. Like most enforcement regimes, however, the means of complying with a clear requirement are left to those persons regulated.

### 3. Procedures Required by Law

■ Plaintiffs' last facial challenge turns on the APA's requirement that agencies observe procedures required by law. 5 U.S.C. § 706(2)(D). The APA itself requires that after a required public notice period, "the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose." 5 U.S.C. § 553(c). Plaintiffs argue that the Agency's failure to incorporate means by which vessels could comply with the bycatch standard violated this procedural requirement. Plaintiffs' Response, docket no. 58, at 15.

■ The purpose of this requirement is to facilitate judicial review. *E.g., Disabled American Veterans v. Gober*, 234 F.3d 682, 692 (Fed.Cir.2000). The statement does not need to include specific and detailed findings and conclusions of the sort associated with formal proceedings, but need only "enable a reviewing court to see what major issues of policy were ventilated by the informal proceedings and why the agency reacted to them the way that it did." *Alvarado Community Hosp. v. Shalala*, 155 F.3d 1115, 1122 (9th Cir.1998). The statement of purpose here was quite detailed: the commentary accompanying publication of the final rule includes a detailed background of the problem, Interim Final Rule re: Amendment 16, 56 Fed. Reg. at 21620; a summary of the changes from the proposed rule published prior to

the last public comment period, *id.;* a lengthy justification section detailing the purpose of the rule, *id.* at 21621; and a summary of the public comments received. *Id.* at 21624. This Court has had no difficulty reviewing the policies aired during the proceedings leading to adoption of the VIP.

### B. As–Applied Challenges

Plaintiffs raise two constitutional challenges to the manner in which the regulations were enforced against plaintiffs. First, plaintiffs revive their claim that they should have had notice that they were required to stop fishing and that this lack of notice violated their due process rights. Plaintiffs then claim that the Agency violated their equal protection rights by selectively prosecuting them when there were other equally egregious offenders. Neither challenge has merit.

### 1. Due Process Challenges to the Enforcement Action

Plaintiffs raise two due process challenges to the Agency's enforcement action. First, plaintiffs claim that the Agency should have given them notice that they would be penalized for continuing to fish. Plaintiff's Memo, docket no. 45, at 28–29. This claim is largely indistinguishable from the same claim leveled against the regulations themselves. As the Court addressed that ·claim in part III.A.2. above, it is necessary only to reiterate here that the regulations were quite clear in what they proscribed: vessels could not exceed an average of 5 kg/mt in any fishing month without risking a monetary penalty. There was no requirement that the vessels stop fishing so no notice need have been given.

Second, plaintiffs claim that the Agency violated their due process rights by penalizing them for continuing to fish after exceeding the bycatch limit. Plain-

tiff's Memo, docket no. 45, at 29–31. Plaintiffs claim they were deprived of a property right without a hearing because the VIP required the plaintiffs to stop fishing and verify the data once an observer recorded a bycatch exceeding the standard. *Id.* at 30. This claim faces several factual problems. First, the regulations required the onboard observer to share the data with the vessel operator. 50 C.F.R. 675.26(d)(2)(v). This procedure gave notice to the vessels of their ongoing bycatch rates. In addition, there is evidence in the record that plaintiffs tracked their own catch rates as well. ALJ's Initial Decisions, AR Vol. III, Tab 95, at 14–15 (ALASKA RANGER); 14–15 (ALASKA I). Second, plaintiffs were not forced to stop fishing the moment the onboard observer's unverified data showed a bycatch rate of 5+ kg/mt. Instead, the decision regarding compliance was left to the vessel operator. Furthermore, the observed data had to be verified as accurate by NMFS before civil fines were assessed against plaintiffs. 50 C.F.R. § 675.26. Finally, plaintiffs unquestionably had a hearing before an ALJ who assessed the penalty for exceeding the bycatch limit. Plaintiffs enjoyed significant procedural due process before being denied any property right.

Plaintiffs base their claims on the findings of the ALJ. Three different times in his findings, the ALJ stated that "the vessel should have ceased fishing." ALJ's Initial Decisions, AR Vol. III, Tab 95, at 16–17 (ALASKA RANGER); 17 (ALASKA I). In support of this position, plaintiffs rely on a line of cases finding due process violations where the government vindictively prosecutes a party for exercising a right to contest a penalty. *Id.* at 8–9. However, *Dan J. Sheehan Co. v. Occupational Safety and Health Review Comm'n,* 520 F.2d 1036 (5th Cir.1975), and the other cases cited by plaintiffs merely

stand for the proposition that the due process clause provides protection against retaliation for exercising one's due process rights. The trigger in these cases is vindictiveness or retaliation. *E.g., Sheehan*, 520 F.2d at 1040–41. Plaintiffs have made no case of penalty enhancement, much less enhancement out of vindictiveness. Plaintiffs have not pointed to any evidence in the record that the ALJ actually punished the plaintiffs for continuing to fish. Instead, the plaintiffs were fined because their bycatch rates significantly exceeded the VIP standards for July and August of 1991.

### 2. Equal Protection Claim

 Plaintiffs also claim that the Agency's punishment of plaintiffs while other violators went unpunished violated their equal protection rights. The Supreme Court recently held that a plaintiff may bring an equal protection claim based on a "class of one." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000). To succeed on such a claim, the plaintiff must prove that it has been "intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Id.* at 564, 120 S.Ct. 1073. Such a claim is similar to a selective prosecution claim, where the plaintiff must demonstrate that the prosecution "had a discriminatory effect and that it was motivated by a discriminatory purpose." *Wayte v. United States*, 470 U.S. 598, 608, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985).

This claim is without merit. Plaintiffs raise a question of fact as to whether there was different enforcement. Plaintiffs' Response, docket no. 58, at 18. But even assuming there was different treatment

here,[6] plaintiff has presented no evidence that the decision to prosecute plaintiffs and no other vessel was irrational or motivated by a discriminatory purpose. Plaintiffs' argument relies on an assumption that different treatment is always irrational or motivated by discrimination. But this assumption is legally unsound and logically absurd: it would not only validate the "everyone–else–was–driving–75" defense but create a cause of action for damages on such a claim. Because plaintiffs have not raised a question of fact as to discriminatory treatment, their equal protection claims cannot survive.

### C. Challenges to the Penalties Assessed

The last batch of challenges goes to the penalties actually assessed against plaintiffs. Plaintiffs argue that the assessment of the penalty was arbitrary and capricious. Therefore, the ALJ had to have considered relevant facts and articulated some reasonable relationship between those facts and the penalty selected in order to survive judicial review. *Washington v. Daley*, 173 F.3d at 1169. Plaintiffs seek relief in the retroactive application of a 1996 amendment to the Magnuson–Stevens Act, assign error to the ALJ's consideration of mitigating factors, and argue that the ALJ did not consider whether these plaintiffs could in fact pay the penalty.

### 1. Retroactive Amendment

 The Magnuson–Stevens Act permits civil fines of up to $100,000 per violation. 16 U.S.C. § 1858(a). Each day of an ongoing violation constitutes a separate violation. *Id.* This section provides the Secretary's general enforcement power. In

---

**6.** This assumption obviates both the need for the defendants' declaration of Susan Auer, who testifies to the contrary, and plaintiffs' argument that the government unreasonably withheld data concerning other violators.

1996, the Act was amended to provide incentives to reduce bycatch in the North Pacific fisheries. As a result, Congress granted a specific power to the North Pacific Fisheries Council to create a system of fines "to provide incentives to reduce bycatch and bycatch rates." 16 U.S.C. § 1862(g). These fines are limited to $25,000 per vessel per season. *Id.*

■ Plaintiffs argue that this amendment retroactively limited the Secretary's general enforcement power under the Act. Plaintiff's Memo, docket no. 45, at 32–37. Plaintiffs' argument turns on a canon of statutory construction stating that when an amendment enacts new substantive law it should not be applied retroactively, but when an amendment merely clarifies existing law no such problems arise and it may be given retroactive effect. *See Beverly Community Hosp. Ass'n v. Belshe,* 132 F.3d 1259, 1265 (9th Cir.1997). The Eleventh Circuit has identified two factors in determining whether an amendment clarifies or whether it enacts substantive law: (1) whether statutory language is ambiguous and therefore in need of clarification, and (2) whether Congress declared its intent to clarify. *Piamba Cortes v. American Airlines, Inc.,* 177 F.3d 1272, 1283–84 (11th Cir.1999).

This approach is of no help to plaintiffs. There was no ambiguity in the general penalty provision of the Magnuson Act: It clearly gave, and continues to give, the Secretary of Commerce power to assess civil penalties of up to $100,000 per violation of the Act. Furthermore, Congress did not indicate anywhere that it was modifying the general provision with the 1996 amendment. Instead, Congress was explicitly granting a new power to create additional incentives to reduce bycatch.

The two sections are related only in that they bestow the power to assess fines. They are unrelated in who they bestow that power upon and for what actions the fines may be assessed. The general penalty provision of the Act gives the Secretary the power to assess fines for any violation of the Act. 16 U.S.C. § 1858(a) ("Any person who is found by the Secretary ... shall be liable ....."). The 1996 Amendment gives a unique power to the North Pacific Council, one of eight fisheries councils, to propose a system of fines only for bycatch reduction. 16 U.S.C. § 1862(g)(1) ("The North Pacific Council may submit, and the Secretary may approve, ... a system of fines ....."). The amendment enacted an additional incentive targeted at the unique circumstances of the North Pacific fisheries, and thereby granted a power to one council without derogating the general powers of the Secretary.

## 2. Consideration of mitigating factors

■ The civil penalties provision of the Magnuson–Stevens Act requires the Secretary to "take into account the nature, circumstances, extent, and gravity of the prohibited acts committed and, with respect to the violator, the degree of culpability, any history of prior offenses, and such other matters as justice may require." 16 U.S.C. § 1858(a). Plaintiffs claim that the Agency acted in an arbitrary and capricious manner because it did not consider different bycatch data, the possibility of compliance, plaintiffs' efforts to reduce bycatch, and "the lack of any economic benefit to plaintiffs for high bycatch rates." Plaintiffs' Memo, docket no. 45, at 37.

The record does not support plaintiffs' position. The record demonstrates that the ALJ did in fact consider such mitigating factors. ALJ's Initial Decisions, AR Vol. III, Tab 95, at 23–24 (ALASKA RANGER); 23–24 (ALASKA I). Furthermore, the evidence before the ALJ suggested that the plaintiffs willfully did not comply with the regulations. AR Vol. II,

Tab 65, at 17. Finally, the ALJ even suspended $50,000 of each vessel's fine for two years. The record displays an express, rational connection between mitigating factors and the penalty chosen.

### 3. Consideration of Ability to Pay

 Finally, plaintiffs allege that the ALJ acted in an arbitrary and capricious manner because he did not consider the plaintiffs' actual ability to pay the assessed fines. At the time this penalty was assessed, the civil penalties provision of the Magnuson–Stevens Act included consideration of the ability to pay within the mandatory "mitigating factors" to be considered by the Secretary. 16 U.S.C. § 1858(a) (1994). Plaintiffs argue that the Agency failed to prove that the plaintiffs had the ability to pay the assessed fines. Plaintiffs' Memo, docket no. 45, at 38.

In what appears to be the only reported decision considering this requirement, the district court in New Jersey noted that the Act, read in conjunction with the APA, places on the Agency the burden of "com[ing] forward with evidence of plaintiff's ability to pay a fine." *Diehl v. Franklin*, 826 F.Supp. 874, 881 (D.N.J. 1993). There, because the Agency produced no evidence of the plaintiff's ability to pay, the ALJ's assessment of a $10,000 penalty was arbitrary and capricious. *Id.* The Agency itself has determined that its burden includes both the burden of production and the burden of persuasion. *In the Matter of Crowell,* 1995 WL 1311351 (N.O.A.A.).

Here, the Agency came forward with sufficient evidence of the plaintiffs' ability to pay. The Agency presented the following evidence: FCA owned eight factory trawlers and 2 factory hook & liners; FCA's good credit record indicated it was able to pay its debts in a timely manner; FCA was profitable enough to acquire a $27 million mortgage; and between the violations and the hearing, FCA had acquired seven or eight additional vessels. AR Vol. II, Tab 65, at 18–19. The ALJ determined that this information, along with the plaintiffs' own testimony at trial satisfied the Agency's burden. ALJ's Initial Decisions, AR Vol. III, Tab 95, at 25 (ALASKA RANGER); 25 (ALASKA I).

Plaintiffs argue that this evidence was not probative of their ability to pay the fines. Plaintiffs' Memo, docket no. 45, at 38. However, this evidence indicates that the company had substantial assets at the time of the assessment. The company could have used these assets as collateral or even liquidated assets, if necessary. Nothing in the statute indicates that "ability to pay" means ability to pay out of cash on hand. As to the individual captains' abilities to pay, the Agency need only have presented evidence of the company's ability to pay, given that liability was joint and several.

## CONCLUSION

Review of the record before the Court indicates that neither the regulations, the enforcement action, nor the penalties assessed violate either the APA or the Constitution. Therefore, summary judgment in favor of the defendants is appropriate. The penalties assessed against plaintiffs are affirmed.

IT IS SO ORDERED.